Renee LOWERY;  Lisa S. Peterson, Plaintiffs–Appellees,

and

Shelby McKnight;  Gregory Fleming;  Sonya Hairston;  Dynelle Johnson;  Nadra Smith;  Ponnette Smith;  Sheila Smith;  Patricia Spencer;  Edward Stokes, Plaintiffs,

v.

CIRCUIT CITY STORES, INCORPORATED, Defendant–Appellant.

Chamber of Commerce of the United States of America;  Washington Legal Foundation;  Equal Employment Advisory Council;  National Retail Federation;  Equal Employment Opportunity Commission;  NAACP Legal Defense and Education Fund, Inc., Amici Curiae.

Shelby McKNIGHT;  Gregory Fleming;  Renee Lowery;  Nadra Smith;  Ponnette Smith;  Sheila Smith;  Patricia Spencer;  Edward Stokes;  Lisa S. Peterson, Plaintiffs–Appellants,

and

Sonya Hairston;  Dynelle Johnson, Plaintiffs,

v.

CIRCUIT CITY STORES, INCORPORATED, Defendant–Appellee.

Chamber of Commerce of the United States of America;  Washington Legal Foundation;  Equal Employment Advisory Council;  National Retail Federation;  Equal Employment Opportunity Commission;  NAACP Legal Defense and Education Fund, Inc., Amici Curiae.

Shelby McKNIGHT; Renee Lowery; Lisa S. Peterson, Plaintiffs–Appellees,

and

Gregory Fleming; Sonya Hairston; Dynelle Johnson; Nadra Smith; Ponnette Smith; Sheila Smith; Patricia Spencer; Edward Stokes, Plaintiffs,

v.

CIRCUIT CITY STORES, INCORPO-RATED, Defendant–Appellant.

Equal Employment Opportunity Commission; NAACP Legal Defense and Education Fund, Inc., Amici Curiae.

Renee LOWERY, Plaintiff–Appellee,

and

Shelby McKnight; Gregory Fleming; Sonya Hairston; Dynelle Johnson; Nadra Smith; Ponnette Smith; Sheila Smith; Patricia Spencer; Edward Stokes; Lisa S. Peterson, Plaintiffs,

v.

CIRCUIT CITY STORES, INCORPO-RATED, Defendant–Appellant.

Nos. 97–1372, 97–1470, 97–1917 and 98–1170.

United States Court of Appeals, Fourth Circuit.

Argued April 9, 1998.

Decided Sept. 14, 1998.

**ARGUED:** Andrew Lewis Frey, Mayer, Brown & Platt, Washington, D.C., for Appellant. David Jay Cynamon, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for Appellees. **ON BRIEF:** Kenneth S. Geller, Donald M. Falk, Peter C. Choharis, Mark S. Davies, Mayer, Brown & Platt, Washington, D.C.; W. Stephen Cannon, Pamela G. Parsons, Teri C. Miles, Circuit City Stores, Inc., Richmond, Virginia, for Appellant. Phillip D. Bostwick, James B. Hamlin, Duane K. Young, Shaw, Pittman, Potts & Trowbridge, Washington, D.C.; Joseph M. Sellers, Avis Buchanan, The Washington Lawyers' Committee for Civil Rights and Urban Affairs, Washington, D.C.; John A. Gibney, Jr., Shuford, Rubin & Gibney, P.C., Richmond, Virginia, for Appellees. Robert J. Smith, Harry A. Rissetto, Mona C. Zeiberg, Morgan, Lewis & Bockius, L.L.P., Washington, D.C.; Stephen A. Bokat, Robin S. Conrad, Sussan L. Mahallati, National Chamber Litigation Center, Inc., Washington, D.C., for Amicus Curiae Chamber of Commerce. John J. Gallagher, Barbara Berish Brown, Neal D. Mollen, Kelly J. Koelker, Paul, Hastings, Janofsky & Walker, L.L.P., Washington, D.C.; Daniel L. Popeo, Paul D. Kamenar, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Foundation. Ann Elizabeth Reesman, Robert E. Williams, McGuiness & Williams, Washington, D.C., for Amicus Curiae Advisory Council; Robert P. Joy, Morgan, Brown & Joy, Boston, Massachusetts, for Amicus Curiae National Retail Federation. C. Gregory Stewart, General Counsel, J. Ray Terry, Jr., Deputy General Counsel, Gwendolyn Young Reams, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, Paul D. Ramshaw, Equal Employment Opportunity Commission, Washington, D.C., for Amicus Curiae EEOC. Elaine R. Jones, Director/Counsel, Theodore M. Shaw, Norman J. Chachkin,

Charles Stephen Ralston, NAACP Legal Defense and Education Fund, Inc., New York, New York, for Amicus Curiae Fund.

Before MURNAGHAN, WILKINS, and HAMILTON, Circuit Judges.

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge HAMILTON wrote the opinion, in which Judge MURNAGHAN and Judge WILKINS joined.

## OPINION

HAMILTON, Circuit Judge:

This case involves claims of racial discrimination brought by eleven African–American current and former employees (collectively, the Plaintiffs) individually and on behalf of all African–Americans employed at the Richmond, Virginia headquarters (HQ) of Appellant, Circuit City Stores, Inc. Circuit City appeals from a jury verdict finding that Circuit City engaged in a pattern or practice of racial discrimination and that Circuit City discriminated against plaintiffs Renee Lowery (Lowery) and Lisa Peterson (Peterson) on account of their race. Circuit City also appeals from the district court's grant of injunctive relief, punitive damages, costs and attorneys' fees. Finally, Circuit City appeals the district court's grant of a motion by Lowery to compel Circuit City's compliance with a portion of the injunctive relief ordered and the district court's award of her reasonable attorneys' fees and costs incurred in connection with her motion in an amount to be subsequently determined. The Plaintiffs cross-appeal the district court's decertification of their class action. We affirm in part, vacate in part, and remand with instructions.

## I

Circuit City owns and operates a rapidly growing chain of retail consumer electronic stores that by January 1996 employed 37,000 "associates" nationwide. By November 1996, Circuit City employed 3,500 people at its Richmond HQ, about 800 of whom were African–Americans. Several hundred other Circuit City employees work for a wholly-owned subsidiary called First North American National Bank (FNANB), which operates as a separate and distinct entity, providing consumer credit to Circuit City's customers.

Lowery, Peterson and the other nine Plaintiffs, Shelby McKnight, Gregory Fleming, Sonya Hairston, Dynelle Johnson, Nadra Smith, Ponnette Smith, Sheila Smith, Patricia Spencer and Edward Stokes, are African–American current and former employees of Circuit City and FNANB. The Plaintiffs filed this action in late 1995, alleging that Circuit City and FNANB (collectively, Circuit City) have a corporate culture of racial animus toward African–Americans, promulgated, fostered and condoned by a group of white senior managers. Plaintiffs claim that Circuit City's all-white management intentionally carried out their racial animus and stereotypical thinking through discriminatory promotion policies and practices that included, among other things: (1) excessively subjective procedures and criteria used to deny opportunities for promotion to qualified African–Americans; (2) making the existence of job promotion vacancies known only through informal networks of white employees rather than through formal job posting procedures; (3) requiring African–American employees to satisfy more onerous requirements for promotion than those required for white employees; and (4) maintaining more onerous performance standards for African–American employees than for similarly situated white employees.

### A. Evidence of a Pattern or Practice of Racial Discrimination

Circuit City's promotion practices are developed in Circuit City's Human Resources (HR) Division. Between 1984 and 1996, HR was headed by William Zierden, a former business professor from the University of Virginia. Zierden believed that large companies are hampered by bureaucracy, including "rigid systems of job descriptions and rigid [qualifications]" for the people to fill job openings. (J.A. 2680). Zierden accordingly implemented an HR system which Circuit City claims limits bureaucracy and gives employees and managers wide freedom of action. Circuit City produced evidence that

this philosophy has strong support among management experts.

Circuit City's management policy requires all managers and supervisors to attend a week-long "Managing Through People" seminar that instructs them in appropriate supervision. (J.A. 2194). Managers receive training on promotions, including how to interview and evaluate employees. According to Circuit City, managers are warned not to use impermissible selection criteria, and are admonished that "Circuit City firmly believes all associates and customers should be treated with respect. We have policies in place to achieve this goal. Circuit City is an equal opportunity employer who has set policies and standards to comply with all federal and state laws which forbid discrimination." (J.A. 1723).

The Plaintiffs claim that Circuit City's management style has encouraged and fostered racial discrimination in promotions. According to the Plaintiffs, Circuit City: (1) has no written procedures indicating how managers and supervisors should go about promoting employees; (2) has no written procedures or practices requiring a review, either by HR or anyone else, of any promotion decision; (3) does not require promoters to post or advertise job openings, but permits them to announce an opening to a single candidate of the promoter's own choosing without notifying anyone else of the vacancy; and (4) when a job opening is posted, has no requirements about what the posting should contain. Furthermore, Plaintiffs allege that a promoter has unfettered discretion to use any procedures he or she desires when making a promotion decision. For example, a promoter has full discretion to establish the minimum qualifications necessary for a position and the weight to be given to the factors considered in making the decision. The Plaintiffs note that the majority of those making promotion decisions at HQ are white, and claim that the result of Circuit City's promotion policies is that only white employees are promoted above the assistant supervisor level.

Circuit City, on the other hand, argues that its promotion policies have produced a racially diverse work force. Circuit City claims that the percentage of African–American employees at HQ increased from 19.5 percent in 1992 to 22 percent in 1995, while the full-time African–American workforce outside the company averaged about 19 percent during this time. Circuit City notes that, of the 6,200 employees at HQ from 1992 to 1995, 1,564 were African–American, with about 100 in professional and managerial positions, and approximately 600 were members of other minorities. Moreover, Circuit City claims that, for each significant occupational category defined by the United States Census Bureau, Circuit City employs more African–Americans than the external labor pool would indicate. As an example, Circuit City mentions that from 1992 to 1995, it hired 375 people within the "officials and managers" category; although the relevant pool was only 4 percent African–American, Circuit City hired over 9 percent African–Americans.

Circuit City also claims that the vast majority of job openings are posted in a company-wide publication, via E-mail, and over a vacancy hotline. Nevertheless, while company policy favors posting vacancies, it does not require it. Moreover, Circuit City does not have formal career paths or mandatory company-wide promotion criteria; instead, supervisors base promotions on many factors, including performance, length of service, time in position, and education. To be promoted, an employee generally must have served at least six months in his/her current position (three months in FNANB) without disciplinary action. However, these rules may be waived.

There is no measurement made by anyone at Circuit City, including HR, as to the effects of these promotion practices and procedures on African–Americans as compared to whites. Zierden could recall only four black managers at HQ during his tenure. Only two out of roughly fifty or sixty group managers and managers in the accounting division were African–American. At FNANB, there has never been an African–American director or manager, and only two African-Americans have risen above the assistant supervisor rank to the level of supervisor.

At trial, Plaintiffs attempted to demonstrate management's racial animus by introducing evidence that certain high level employees of Circuit City have made racially disparaging comments. For example, Zierden allegedly advised Larry Jones, an applicant for a position in HR, that "the caliber of minorities and blacks who are in the company, in Circuit City, would not meet the standards for a corporate headquarters type job, and in particular this type job." (J.A. 3145). He also allegedly said that blacks who worked in Circuit City's retail stores "had a propensity to steal." (J.A. 3145–46). As for blacks in decision-making roles at Circuit City, Zierden allegedly told Jones there were "few, if any," blacks in such jobs and "he didn't see that situation changing anytime soon because ... those people who would be maybe eligible to be promoted upward just weren't there." (J.A. 3148). Zierden allegedly made similar comments to others. Complaints about Zierden to Circuit City's CEO, Rick Sharp, allegedly had no effect.

The Plaintiffs also attempted to demonstrate management's racial animus by introducing evidence that Zierden "buried" two internal reports, known as the Booth and Cook Reports, that were critical of Circuit City's promotion policies and diversity results. In December 1990, Zierden instructed Karen Booth, an employee in HR, to perform a study of how well Circuit City manages diversity in its workplace. Booth's January 1991 report noted, among other things, that statistics on Circuit City's store employees showed that "[t]he promotion ratio for male and non-minority [sales] counselors are [sic] significantly higher than those for women and minorities." (J.A. 838). Booth concluded that "[i]t is my assumption that many female and minority associates look up the ladder and see no one there like themselves. They perceive no upward mobility beyond a certain level and they look for opportunities outside the company." (J.A. 864, 2641). Zierden allegedly directed Booth to retrieve all copies of the report that she had given to other managers, and never discussed the report with any other Circuit City executives. The Plaintiffs assert that Zierden never independently checked the accuracy of Booth's statistical findings, nor attempted any kind of statistical analysis of promotion rates between minorities and non-minorities or of differences in rates of salary growth between blacks and whites.

In May 1995, Circuit City retained Sarah Cook, a graduate student in psychology at the University of Virginia, to conduct a survey and prepare a written report on employee job satisfaction at FNANB. Cook worked on the project for approximately seven months, was paid approximately $6,500 by Circuit City, and produced a written report in January 1996. Cook's report noted, among other things, employee concerns that one had to belong to certain cliques in order to get promoted, and that minorities felt excluded. Comments by survey respondents included: "I hate to express this but race affects promotions" and "Minorities are constantly overlooked for promotions and will continue to be overlooked until someone takes legal action against FNANB." (J.A. 1106). Cook's report concluded that a sizeable number of associates perceived that minority associates are not treated equally to majority associates. Cook had recommended that Circuit City review its company policies and practices, but noted that the company's response was defensive and dismissive.

Circuit City never distributed the Cook report to its employees, but instead circulated a short memorandum purporting to summarize the survey's results. The memorandum said nothing about Cook's findings and recommendations about promotion procedures. Moreover, according to the Plaintiffs, Circuit City took no action concerning the complaints about promotions, and made no changes in its promotion practices.

## B. Evidence of Individual Discrimination

In addition to the allegation of a pattern or practice of discrimination, the Plaintiffs claimed they suffered individual discrimination due to their race. Plaintiff Lowery joined Circuit City in October 1989 as a management recruiter in HR after completing her MBA. Lowery's manager, Catharine Madden, gave Lowery high performance reviews through mid–1994, although it appears Madden gave most of her employees high

ratings. Lowery performed her recruiting responsibilities well, exceeding her numerical recruiting goals through July 1995, and became Circuit City's most senior and highly paid recruiter. Despite this success, however, Lowery unsuccessfully sought approximately seven promotions in seven years.

Circuit City produced evidence that, notwithstanding Lowery's recruiting skills, she had several problems throughout her tenure. Although Lowery performed well for some hiring managers, Circuit City claimed she neglected following up for others, and one recruiter even asked not to work with her again. Evidence was presented that she had problems training new recruiters, showed little leadership and, according to her peers, she was not a team player. Circuit City asserted that Lowery did not participate in staff meetings, volunteer to attend job fairs, or share resumes with other recruiters. She also allegedly lacked focus in interviews, and one African–American supervisor found Lowery's oral style rambling and unstructured. When Lowery asked how to improve her chances of being promoted, she allegedly failed to take the steps that were suggested.

Lowery also presented evidence of Circuit City's alleged animus towards minorities. Lowery discovered, years after the fact, that the words "velveteen ghetto" had been handwritten on her 1989 interview schedule. (J.A. 881, 2137–38). She testified at trial that, in 1991, when she approached Austin Ligon, Vice President of Corporate Planning, about a position in his department, he suggested that she "could do better someplace else" at a company that was "more receptive to minorities and women." (J.A.2091). Later, in 1993, Zierden allegedly told her he believed that sales decreased in stores with black managers, and that stores with Hispanic managers soon had only Hispanic employees.

One of Lowery's claims involved her application in October 1994 for a promotion to Supervisor of Management Recruiting. Cynthia Turner, Lowery's new manager, wanted to promote one of the department's recruiters to the position. Turner interviewed everyone in the department including Lowery and Paige Bell, who, along with Lowery, had also expressed interest in the position. The promotion was offered to Paige Bell, and Lowery asserts this decision was because Bell was white. Lowery noted that, while she had an undergraduate business degree and an MBA, Bell had neither. Lowery also had more supervisory experience before joining Circuit City, and had more seniority. Jeanne Linton, then the director of recruiting, testified that Lowery was one of her top three recruiters, yet admitted that the other two top recruiters, both of whom were white, were promoted to supervisory positions within five years of starting with Circuit City, while Lowery has never been promoted during her seven years with the company.

Circuit City, on the other hand, claims Bell got the position because she was more organized than Lowery. For example, Circuit City produced evidence that, during her interview, Bell used an out line she had prepared which described ways to improve the department. Lowery, by contrast, allegedly rambled her way through the interview. Moreover, Circuit City claimed that there had been no complaints about Bell's recruiting style, that she participated in staff meetings and job fairs, and had once even managed the department while Madden was on leave and had earned her colleagues' respect.

Plaintiff Peterson also alleges she was passed up for promotion because of her race. Peterson joined FNANB in February 1993 as an account management representative. In July 1993 she entered FNANB's training program, which rotates associates through different departments every few months. In May 1994, Peterson rotated into an acting assistant supervisor position in the customer service mail department. It appears that Peterson again rotated into that department some time later. When a regular position became available in that department, Peterson applied for the position. Peterson's supervisor, Jodi Bischoff, rejected Peterson in favor of Janet Whalen, who is white. However, when offered the position, Whalen turned it down. Nevertheless, Circuit City did not then offer the promotion to Peterson, but allegedly handpicked another employee, Denise Ramos, for the position. Peterson left FNANB soon thereafter.

Peterson presented evidence that she was employed at FNANB at a time in which it grew from seven to 1,200 employees, and yet FNANB had no African–Americans among its twenty to thirty directors and managers, and had only two African–Americans among its thirty to forty lower-level supervisors. Throughout her employment she received consistently high performance evaluations, allegedly until she applied for promotion. According to Peterson, Whalen had less experience than she did because Whalen had only one rotation as an FNANB trainee; Whalen never received supervisory experience in the customer service mail department; and Whalen had no familiarity with the reports and monitoring expected of an assistant supervisor in that department.

According to Peterson, Ramos had no prior customer service experience, no knowledge of the operating functions of the bank, no background contacting customers, and no knowledge of the company's computer system. Witnesses for Circuit City also admitted that, when Ramos was selected for the position, she was struggling in her current assistant supervisory position in another department and could not keep pace with her duties.

Circuit City, on the other hand, presented evidence that Whalen was selected over Peterson because Whalen was better qualified. While Peterson did not possess the college degree that FNANB preferred for supervisory positions, Whalen was a college graduate and former assistant supervisor. Bischoff testified that Peterson was also rejected because her performance was deficient during her two rotations as assistant supervisor. Peterson had been repeatedly cautioned for wasting work time by socializing with her supervisees, had submitted late and inaccurate monthly reports, and had completely failed to distribute three other reports. Moreover, Peterson allegedly could not competently analyze reports to identify trends in customer behavior. Finally, Circuit City alleges that Peterson received several oral warnings about her responsibilities, but she still neglected her supervisory role while she attempted to master the paperwork.

## C. Proceedings in the District Court

Plaintiffs filed this case in the United States District Court for the District of Maryland on October 31, 1995, alleging, pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17, that they represented a class of African–American current and former employees at HQ who were victims of Circuit City's intentional pattern or practice of racial discrimination in employment.[1] In all, Plaintiffs' complaint alleged fifty instances of discriminatory hiring, promotions and transfers at HQ. The Plaintiffs sought: (1) a declaration that Circuit City's actions violate Title VII and § 1981; (2) a permanent injunction prohibiting Circuit City from engaging in racially discriminatory conduct and requiring it to take measures to dismantle its racially discriminatory practices; (3) compensatory damages for financial loss, humiliation, embarrassment, emotional distress, mental anguish, deprivation of the right to contract on an equal basis with other persons regardless of race and deprivation of opportunities of promotion, compensation and transfer; (4) punitive damages; and (5) an award of attorneys' fees and expenses.

On November 29, 1995, the Maryland District Court transferred the case to the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a). On February 25, 1996, the district court dismissed the claims of Hairston and Johnson as time barred, leaving a suit aggregating forty-six claims by nine Plaintiffs.

On April 30, 1996, the district court granted the Plaintiffs' motion to certify the suit as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2). The district court certified a mandatory, non-opt-out class composed of all African–Americans employed at HQ after April 18, 1992. The district court

---

1. The original complaint only alleged claims under § 1981. In addition, Peterson filed her case separately, but the district court consolidated her case with that of the other ten plaintiffs. The Plaintiffs later amended their complaint to include class action claims under Title VII and to add Peterson as a plaintiff.

found that the Plaintiffs satisfied the commonality, typicality, adequacy of representation, and numerosity requirements of Federal Rule of Civil Procedure 23(a) in alleging that subjective decision-making processes had caused racial discrimination against black Circuit City employees. Noting that Rule 23(b)(2) certification is typically granted in employment discrimination cases even where monetary damages are requested, the district court certified the class in accordance with Rule 23(b)(2). However, the district court stated that the certification was conditional; if events so warranted, the district court reserved the ability to alter or decertify the class pursuant to Rule 23(c)(1).

On August 23, 1996, the district court, *sua sponte,* did in fact decertify the class because of what it deemed problems of fairness and efficiency. During discovery, the Plaintiffs had filed a list of forty-six non-named class members they planned to call as trial witnesses, and acknowledged the existence of perhaps 200 additional class members with claims. Plaintiffs moved to have the district court sever the issues and adopt a bifurcated trial plan whereby the case would be tried in two stages. In Stage 1, a jury (the Class Jury) would decide class-wide liability and punitive damages, along with liability and compensatory damages on the individual claims. In Stage 2, compensatory damages for class members would be determined.[2]

The district court determined that a class action would be unfair and inefficient. First, the determination in Stage 1 of punitive damages for the entire class would be based only on evidence of (1) disparate treatment as to the class and (2) actual harm and compensatory damages as to the named Plaintiffs. In

other words, the Class Jury would make its determinations without the entire universe of information, including actual harm to the individual class members and Circuit City's legitimate, non-discriminatory reasons for allegedly adverse employment actions. The district court found this to be unfair to Circuit City. Second, the district court found the method of trying class members' claims to a series of two-week juries to be cumbersome and inefficient. Moreover, evidence Circuit City would bring forth to rebut individual claims in Stage 2 would be relevant and admissible in Stage 1, thus inviting the needless repetition of evidence. The district court concluded that the benefits of class certification—accelerated and efficient disposition—would not necessarily follow in the case, but unfairness to Circuit City would be a likely result.

The district court held that the trial of the individual Plaintiffs' claims would proceed to trial as scheduled, where the issues of individual liability, damages and punitive damages would be litigated. The district court held that the Plaintiffs would be allowed to produce evidence at trial of pattern or practice discrimination, and Circuit City would be permitted to fully defend the pattern or practice claim. If there was a finding of pattern or practice discrimination, the district court stated that Circuit City would be collaterally estopped from denying the existence of such discrimination at subsequent trials. Finding this method of case management to be more fair and efficient, the district court decertified the class. However, the district court granted the Plaintiffs' motion to stay the order decertifying the class until the end of the trial.

---

2. The Plaintiffs' proposed trial plan was as follows. In Stage 1, the Class Jury would determine: (1) class-wide liability, including whether Circuit City engaged in a pattern or practice of racial discrimination with respect to promotions or transfers at HQ; (2) class-wide punitive damages; (3) liability and compensatory damages for the named Plaintiffs. At the conclusion of Stage 1 the Class Jury would be discharged and, if appropriate, the court would grant declaratory and/or injunctive relief.

If there was a finding of class-wide discrimination during Stage 1, then Stage 2 proceedings would commence. Notice of claims would be sent to class members, who would be allowed to

file claims. The parties would be permitted to conduct limited discovery concerning these claims, and the class members' claims would be tried to a series of separate juries, each sitting for approximately two weeks, until the claims of all class members had been heard. These separate juries would determine whether each class member was a victim of Circuit City's discriminatory conduct and, if so, the amount of compensatory damages to be awarded to that class member. Finally, the court would determine and award each Plaintiff and class member receiving compensatory damages a portion of the total punitive damages approved by the court.

On October 23, 1996, the district court granted Circuit City's motions for summary judgment as to the claims of N. Smith, S. Smith and Spencer. Thus, nineteen claims by six Plaintiffs went to trial. Trial commenced on October 28, 1996, and lasted for one month. At the beginning of the trial, the district court re-emphasized the procedural posture of the case, stating "[t]his is a case involving six individual plaintiffs.... Don't misunderstand." (J.A.2042–43).

The majority of Plaintiffs' case focused on the pattern or practice of discrimination that allegedly resulted from Circuit City's insufficiently regimented management practices. The Plaintiffs presented the testimony of twenty-three African–American employees or former employees at Circuit City's HQ. Many of these witnesses testified they left Circuit City because they were frustrated by seeing whites get promoted while they stayed in non-managerial positions. Many witnesses testified they (1) often learned of promotions only after white co-workers had been selected by a white supervisor without posting or otherwise advertising the existence of the opportunity; (2) were ignored or intimidated for complaining about promotion procedures; (3) feared retaliation if they used Circuit City's "open door" procedures; (4) were subjected to racial slurs from their supervisors, or to remarks evidencing a corporate culture of stereotypical thinking and racial animus; and (5) received lower performance ratings, making them then ineligible for promotions, after Circuit City learned of their involvement in this action.

Plaintiffs also presented at trial the testimony of a statistical expert, Dr. Andrew Harless, a labor economist. In his written report and testimony during the trial, Harless opined that: (1) the promotion rates for black employees at HQ from April 1992 through December 1995 were substantially lower than the promotion rates for similarly-situated white employees; and (2) those differences were at a statistically significant level well beyond that normally applied in academic and scientific research. Circuit City introduced its own statistical experts, Drs. Joan Haworth and Peter Kolesar, who refuted Harless' conclusions, and opined that his statistics showed no evidence of racial discrimination.

At the close of the Plaintiffs' case, Circuit City moved for judgment as a matter of law on the claims of the remaining six Plaintiffs and the issue of whether Circuit City had engaged in an intentional pattern or practice of racial discrimination. The district court granted Circuit City's motion for judgment as a matter of law on the claims of P. Smith, Fleming and Stokes, but denied their motions with regard to the claims by Lowery, Peterson, and McKnight. As for the pattern or practice issue, the district court held that it was "a classic situation where a jury needs to resolve the matter." (J.A. 2824).

On instructing the jury, the district court stated that the jury had to resolve the pattern or practice question before considering whether any of the specific claims of discrimination had been established. The district court submitted a special verdict form to the jury containing twenty-four questions. The first question inquired whether the jury found that Circuit City had engaged in a pattern or practice of racial discrimination in promotions against its former and present African–American employees at its Richmond, Virginia headquarters. The district court instructed the jury that, if they answered the question in the affirmative, they were permitted—but not required—to infer that individual promotion decisions were affected by the pattern or practice. The special verdict form then asked whether Circuit City had discriminated against the three remaining Plaintiffs in fifteen claims for discrimination as to promotion. Finally, the district court entered an order lifting the stay of its earlier decertification order.

After deliberating for two and one-half days, the jury returned a verdict on December 2, 1996. The jury unanimously found that (1) Circuit City had engaged in a pattern or practice of racial discrimination; (2) Circuit City had promoted Bell over Lowery because of race; and (3) Circuit City had promoted Whalen and Ramos over Peterson because of race. However, the jury rejected all of McKnight's claims, Lowery's other two claims, and Peterson's other eight claims. In

all, the jury found in favor of the Plaintiffs on three of fifteen claims.

On Lowery's successful claim, the jury awarded her $12,500 in economic and compensatory damages and $225,000 in punitive damages. On Peterson's two successful claims, the jury awarded her $4,200 in economic and compensatory damages and $47,000 in punitive damages. On December 3, 1996, the district court entered judgment, including a judgment in favor of Plaintiffs on a pattern or practice claim. On March 12, 1997, the district court denied Circuit City's post trial motion to set aside the award of economic, compensatory and punitive damages or, in the alternative, for a remittitur, and denied Circuit City's renewed motion for judgment as a matter of law.

After a hearing on Plaintiffs' motion for a permanent injunction, the district court imposed a permanent injunction which: (1) prohibited Circuit City from engaging in any act or practice that has the purpose or effect of discriminating against any African–American employee at HQ because of his or her race; (2) required Circuit City to promote persons at HQ without regard to their race on the basis of objective, job-related and racially neutral standards; (3) prohibited Circuit City from taking "any adverse employment action against any African American employee or prior employee" (J.A. 772); (4) required Circuit City to create and staff a Department of Diversity Management, the Director of which would be principally responsible for insuring that Circuit City complied with the terms of the injunction, and the hiring of whom would be subject to comment by the Plaintiffs and court approval; (5) required Circuit City to develop within ninety days a program of diversity management, including methods and procedures to be used to prevent and eliminate discrimination with respect to promotions; and (6) required Circuit City to develop within ninety days of the Director's hiring a revised program for promotions at HQ, subject to comment by the Plaintiffs and approval, modification or rejection by the district court.

The district court set forth specific requirements that the new promotion programs must meet, including: (1) the use of common, written procedures and guidelines governing promotion selections; (2) the analysis of job openings to identify the criteria for selection; (3) the preparation of position descriptions; (4) the posting and dissemination to all HQ employees of notices of all job vacancies; (5) the keeping of records of all promotions, including the race of each applicant; (6) the review by the Director of Diversity of all promotion recommendations; (7) the establishment of career development and mentoring for all African–American employees at HQ; (8) the monitoring and measurement of the performance of all promoters; (9) the revision of procedures for granting merit reviews of all HQ employees; (10) the revision of procedures to handle racial discrimination complaints; (11) the creation of a new diversity management training program for all promoters. The district court also required various and detailed reports from Circuit City's new Diversity Director.

In a separate section of the injunction, Section B, the district court ordered Circuit City to promote Lowery immediately to the position of Supervisor of Management Recruiting, or an equivalent position, and pay her the difference in salary and benefits that she would have earned between the date of the jury verdict and the date of her promotion.[3]

The district court retained jurisdiction of the case for at least five years, and thereafter for as long as would be required to carry out the purposes of its order. Breach of the injunction would entitle the Plaintiffs to file a motion for enforcement and for appropriate sanctions. Finally, Plaintiffs' counsel would be allowed to apply to the court quarterly for fees and expenses reasonably incurred in the monitoring and enforcement of the order.

Circuit City filed a timely appeal from the district court's judgment on the pattern or practice claim, the award of economic, compensatory and punitive damages to Lowery and Peterson, the injunction, and the denial of Circuit City's renewed motion for judg-

---

**3.** Because Peterson had left FNANB, the Plaintiffs' motion for a permanent injunction did not ask for, and the injunction did not grant, similar relief for Peterson.

ment as a matter of law. The Plaintiffs then cross-appealed from the district court's order decertifying the class action, the district court's orders dismissing the claims of the other six Plaintiffs, and the entry of judgment in favor of Circuit City on McKnight's claims. In addition, the Plaintiffs ask this Court to amend the pattern or practice judgment to include the entire class.

On June 25, 1997, the district court granted Plaintiffs' application for attorneys' fees and costs in the amount of $3,911,504. Relying mainly on its finding that Plaintiffs succeeded on the pattern or practice claim, "[a] significant issue in litigation which 'achieve[d] some of the benefit the parties sought in bringing suit,'" the district court stated that Plaintiffs obtained excellent results in their civil rights suit and their attorneys should recover a full compensatory fee. (J.A. 4370) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). The district court rejected Circuit City's argument that, because only two of the original eleven Plaintiffs prevailed in the suit, and because the amount of damages awarded on only three out of fifty claims was very small, an award of attorneys' fees and costs of nearly $4 million was excessive. The district court made some minor adjustments in the number of hours billed, but essentially awarded full fees and costs to the Plaintiffs. Circuit City timely appealed this award of attorneys' fees and costs.

On July 15, 1997, we granted Circuit City's emergency motion to stay, pending appeal, all provisions of the injunction except those in Section B relating to Lowery.

On January 7, 1998, the district court granted a motion by Lowery to compel Circuit City's compliance with Section B of the injunction. The district court concomitantly ordered Circuit City to pay Lowery's "lawyers their reasonable attorneys' fees and costs incurred in connection with th[e] motion to compel compliance." (Supplemental J.A. 8). The district court then directed Lowery's attorneys to file fee and cost re-

quests along with supporting documentation by January 16, 1998. Circuit City filed a notice of appeal from the district court's January 7, 1998 order.[4]

## II

■ We first consider the Plaintiffs' cross-appeal of the district court's order decertifying their class action. We review a district court's decision to decertify a class action for abuse of discretion. *See Kidwell v. Transportation Communications Int'l Union,* 946 F.2d 283, 305 (4th Cir.1991) (citing *Stott v. Haworth,* 916 F.2d 134, 139 (4th Cir.1990); *Zimmerman v. Bell,* 800 F.2d 386, 389 (4th Cir.1986)). Issues such as class action manageability are "properly committed to the district court's discretion, because that court generally has a greater familiarity and expertise with the practical and primarily factual problems of administering a lawsuit than does a court of appeals." *Central Wesleyan College v. W.R. Grace & Co.,* 6 F.3d 177, 185 (4th Cir.1993) (internal quotation marks and ellipses omitted).

■ The Plaintiffs first argue that the district court erroneously decertified the class action because, if the four requirements of Federal Rule of Civil Procedure 23(a) are satisfied, the district court is not at liberty to consider other factors in deciding whether to certify a class. In effect, Plaintiffs argue that, once the requirements of Rule 23(a) are met, the district court loses its discretion to certify or decertify the class. This argument, however, does not comport with either the language of Rule 23 or this court's precedent. First, Rule 23 states that an action "may" be maintained as a class action if the listed requirements are met. *See* Fed. R.Civ.P. 23(a) and (b). The Rule does not say that, once the requirements are met, the district court "must" certify and maintain the suit as a class action.

■ Second, we have previously held that district courts have broad discretion in deciding whether to certify a class. *See In re*

---

4. After briefing and oral argument in the instant consolidated appeal, on July 21, 1998, the district court ordered Circuit City to pay Lowery $46,075.00 in attorneys' fees and costs in con-

nection with her motion to compel Circuit City's compliance with Section B of the injunction. This fee and cost award is the subject of a separate appeal that is not part of the instant appeal.

*Catawba Indian Tribe,* 973 F.2d 1133, 1136 (4th Cir.1992). This broad discretion necessarily implies that the district court may appropriately consider factors other than those listed in Rule 23 in determining whether to certify a class action. *See, e.g., Amchem Prods., Inc. v. Windsor,* —— U.S. ——, ——, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997) (stating that settlement is relevant to class certification); *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 159, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (considering principles of efficiency and economy of litigation); *Califano v. Yamasaki,* 442 U.S. 682, 702–03, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) (stating that, when the district court is asked to certify a nationwide class, it is appropriate to consider both whether nationwide relief is appropriate and whether such a class would improperly interfere with other litigation in other judicial districts); *Boughton v. Cotter Corp.,* 65 F.3d 823, 827 (10th Cir.1995) (stating that, in a case where injunctive relief was requested and certification was otherwise legally permissible under Rule 23(b)(2), the district court did not abuse its discretion in refusing to certify the class because the relief sought was nonetheless primarily money damages); *In re A.H. Robins Co.,* 880 F.2d 709, 740 (4th Cir.1989) (holding it was proper in determining certification to consider whether certification would "foster settlement of the case with advantage to the parties and with great saving in judicial time and services"), *abrogated on other grounds by Amchem,* 117 S.Ct. at 2247–48. *See also* 7B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1785, at 119, 122 (2d ed.1986 and Supp.1998) (stating that, in exercising the "broad discretion" to decide whether to allow a suit to proceed as a class action, some courts have ruled it is appropriate to take account of considerations not expressly addressed in Rule 23, including manageability in Rule 23(b)(2) cases) (collecting cases, including *In re A.H. Robins, supra* ). *But*

*see Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1105 (5th Cir.1993) ("[Q]uestions of manageability and judicial economy are ... irrelevant to 23(b)(2) class actions."). If, as the district court found here, other factors exist that militate against trying the case as a class action, it is appropriate for the district court to decertify the class. *See Stott,* 916 F.2d at 139 ("[A]n order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate.") (citing *Stastny v. Southern Bell Tel. & Tel. Co.,* 628 F.2d 267, 273–76 (4th Cir.1980)). As set forth above, the district court has such broad discretion to certify a class because it is intimately familiar with such practical and factual intricacies of the suit. *See Central Wesleyan College,* 6 F.3d at 185.

Here, the district court had legitimate concerns that trying the suit as a class action would be unwieldy and unfair to Circuit City. First, the district court rightly questioned whether the Plaintiffs' proposed trial procedure would be an efficient or accelerated method of disposing of the claims. While holding two-week trials with separate juries on the class members' claims would have doubtlessly been more efficient and accelerated than bringing dozens of individual suits, that fact does not require the district court to certify a class action that would nevertheless be inefficient and cumbersome.[5] Second, the district court had legitimate concerns about fairness. The Plaintiffs' proposed trial method would allow the Stage 1 jury to determine punitive damages before the Stage 2 jury hears evidence of actual harm to the class members or Circuit City's proffered justifications for its adverse employment decisions. It would have been entirely possible that the evidence adduced in Stage 1 would have resulted in stiff punitive damages, while the evidence of actual harm presented in Stage 2 would have

---

**5.** We note that, in affirming the district court's decertification of the class due to concerns about case manageability, we do not mean to imply that the factors for certifying a Rule 23(b)(3) class should be imported into Rule 23(b)(2) classes. Nevertheless, because efficiency is one of the primary purposes of class action procedure, *see Falcon,* 457 U.S. at 159, 102 S.Ct. 2364 (citing *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)), we hold that in appropriate circumstances a district court may exercise its discretion to deny certification if the resulting class action would be unmanageable or cumbersome.

shown that Circuit City's actions were not sufficient to merit compensatory damages, or even egregious enough to have merited punitive damages. We cannot conclude that such concerns led the district court to abuse its discretion in decertifying the class.

The Plaintiffs also argue, as do several of the *amici curiae,* that decertification was inappropriate because (1) the statute of limitations began running against the class members; (2) each former class member will now have to retain counsel and file a separate suit; (3) class action procedure is an important tool for the effective enforcement of civil rights laws; and (4) courts routinely certify Title VII classes under Rule 23(b)(2). Similarly, *amici* NAACP and the EEOC argue that Rule 23(b)(2) was intended to facilitate the bringing of class actions in civil rights cases, and that class actions are a favored means for both ending systemic discrimination and obtaining full relief for all the victims of such discrimination. Although these statements may be absolutely true, they are beside the point. If we were to hold these factors to be the predominant considerations for certifying a civil rights class, then nearly every suit alleging a pattern or practice of discrimination would be certified for class action because these factors would exist in nearly every case. However, the Supreme Court has rejected the proposition that merely alleging a pattern or practice of discrimination automatically entitles plaintiffs to class certification. *See Falcon,* 457 U.S. at 155–57, 102 S.Ct. 2364; *East Texas Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 405–06, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

In conclusion, we hold that the district court's concerns about fairness and efficiency did not lead it to abuse its discretion in decertifying the class action.

### III

Circuit City next argues that the judgment of the district court with respect to the Plaintiffs' § 1981 and Title VII claims must be

reversed because individuals do not have a private, non-class cause of action for pattern or practice discrimination and the Plaintiffs failed to offer either direct evidence of discrimination or circumstantial evidence of discrimination sufficient to establish claims of disparate treatment under the *McDonnell Douglas* method of proof. The Plaintiffs, on the other hand, argue that an individual cause of action alleging a pattern or practice of discrimination by the employer should be permitted because "[t]here is absolutely no logical or legal reason why *any* plaintiff cannot prove his disparate treatment theory in a § 1981 and/or a Title VII claim" through a pattern or practice claim and, therefore, the method of proof set forth in *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), is applicable. (Appellees' Br. at 15) (emphasis in original). We agree with Circuit City that individuals do not have a private, non-class cause of action for pattern or practice discrimination under § 1981 or Title VII. We further agree, with the exception of plaintiffs Lowery and Peterson, that the Plaintiffs failed to offer either direct evidence of discrimination or circumstantial evidence of discrimination sufficient to establish claims of disparate treatment under the *McDonnell Douglas* method of proof.[6]

Section 707 of Title VII, 42 U.S.C. § 2000e–6, allows the federal government, either through the EEOC or through the Attorney General, to bring a civil action directly against an employer charging systematic discrimination against a protected group. In these cases, the government has to demonstrate that there exists "a pattern or practice of resistance to the full enjoyment of any of the rights secured by [Title VII]. . . ." 42 U.S.C. § 2000e–6(a). The government's burden in a pattern or practice action is to "prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. It ha[s] to establish by a preponderance of the evidence that racial discrimination [is] the company's standard operating

---

**6.** Our case law recognizes that "the framework of proof for disparate treatment claims—that is, whether the employer intentionally discriminated against the employee—is the same for actions brought under Title VII or § 1981." *Mallory v.*

*Booth Refrigeration Supply Co.,* 882 F.2d 908, 910 (4th Cir.1989). Accordingly, our discussion below regarding the Plaintiffs' Title VII claims encompasses their claims under § 1981.

760

procedure—the regular rather than unusual practice." *Teamsters,* 431 U.S. at 335–36, 97 S.Ct. 1843 (footnote and internal quotation marks omitted). At this initial "liability" stage, the government is not required to prove that any particular employee was a victim of the pattern or practice; it need only establish a *prima facie* case that such a policy existed. *See id.* at 360, 97 S.Ct. 1843. Once established, the burden of proof then shifts to the employer to demonstrate that the government's showing of a pattern or practice of discrimination is either inaccurate or insignificant. *See id.* If the employer fails to rebut the government's *prima facie* case, the resulting finding of a discriminatory pattern or practice gives rise to an inference that all employees subject to the policy were its victims and are entitled to appropriate remedies. *See id.* at 362, 97 S.Ct. 1843. Such a finding justifies an award of prospective relief, but the government may also seek individual relief for the victims of the discriminatory practice. *See id.* at 361, 97 S.Ct. 1843. In such a case, the district court usually conducts proceedings in a "remedial" stage to determine the scope of individual relief. To obtain relief for individual employees, the government must demonstrate that the employees were actual victim of the policy. *See id.* at 362, 97 S.Ct. 1843. However, the burden still remains on the employer to prove that the employee was denied an employment opportunity for lawful reasons. *See id.* at 361–62, 97 S.Ct. 1843.

Although § 707 applies to suits brought by the government, the *Teamsters* decision implicitly endorsed the application of pattern or practice principles and rules of proof to class action lawsuits brought by private parties. *See id.* at 357–60, 97 S.Ct. 1843. The courts of appeals have seized on that endorsement and permitted pattern or practice class action suits using the *Teamsters* method of proof. *See, e.g., Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1559 (11th Cir.1986); *Sledge v. J.P. Stevens & Co.,* 585 F.2d 625, 637 (4th Cir.1978).

■ On the other hand, in a private, non-class action, where individual plaintiffs allege discrimination in violation of Title VII, the plaintiffs typically prove that discrimina-

tion by satisfying the shifting burden of proof scheme set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. A plaintiff attempting to prove a Title VII claim of discrimination with circumstantial evidence must first establish a *prima facie* case. *See id.* at 802, 93 S.Ct. 1817. In order to establish a *prima facie* case of, for example, failure to promote, the plaintiff must show: (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination. *See Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994); *Alvarado v. Board of Trustees of Montgomery Community College,* 928 F.2d 118, 121 (4th Cir.1991). In a case such as this, where the plaintiffs are alleging that they were passed over for promotions because they were black, the fourth prong can be satisfied by a showing that the positions were filled by white applicants. *See Carter,* 33 F.3d at 458. Once the plaintiff has established a *prima facie* case of discrimination, the burden of production shifts to the employer to rebut the plaintiff's *prima facie* case by articulating a legitimate, non-discriminatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. In a case such as the one before us, the employer may rebut the plaintiff's *"prima facie* case by demonstrating that the white selectee was better qualified for the position." *Carter,* 33 F.3d at 458. If the employer articulates a legitimate, non-discriminatory reason for the employment action, the plaintiff bears the burden of proving that the employer's articulated reason is a pretext for discrimination. *See id.*

■ At this point, the issue before us is whether individuals have a private, non-class cause of action for pattern or practice discrimination and, thus, may avail themselves of the *Teamsters* method of proof. For the reasons stated below, we conclude that, although such plaintiffs may use evidence of a pattern or practice of discrimination to help

prove claims of individual discrimination within the *McDonnell Douglas* framework, individual plaintiffs are not entitled to the benefit of the *Teamsters* method of proof.

The Supreme Court has never applied the *Teamsters* method of proof in a private, non-class suit charging employment discrimination. Rather, the Court has noted that there is a "manifest" and "crucial" difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination. *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). In a class action pattern or practice case, the plaintiffs first litigate the common question of fact, i.e., whether the employer utilized a pattern or practice which discriminated against the class. *See id.* at 880, 104 S.Ct. 2794. When the class plaintiffs prove the existence of a discriminatory practice, then that finding benefits them in the adjudication of individual claims by creating a presumption that the individual class members were victims of the discriminatory practice. *See Teamsters,* 431 U.S. at 361–62, 97 S.Ct. 1843.

On the other hand, an individual plaintiff in a private, non-class action alleging employment discrimination is not litigating common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Evidence of a pattern or practice of discrimination may very well be useful and relevant to prove the fourth element of a *prima facie* case, that the individual's adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination, *see Carter,* 33 F.3d at 458; *Alvarado,* 928 F.2d at 121, or that the employer's articulated reasons for the adverse action was merely pretext, *see Carter,* 33 F.3d at 456, or to establish the plaintiff's ultimate burden. However, statistics alone cannot establish a *prima facie* case of individual disparate treatment, for all four elements of a *prima facie* case must be established. *See Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131–32 (11th Cir.1984). The Supreme Court has never

indicated that an inference of discrimination should arise in an individual case until the plaintiff has proved *all* elements of a *prima facie* case. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

We also note that class action pattern or practice suits differ from disparate treatment suits in the nature of their remedies. Class action pattern or practice suits primarily seek to redress widespread discrimination and the harm suffered by the group of individuals subjected to that discrimination. Accordingly, the relief typically sought in class action pattern or practice suits is injunctive and may include such aspects as, for example, affirmative action plans and the altering of a seniority system. *See* 1 Larson, *Employment Discrimination* § 8.01[3], at 8–14 (2d ed.1994). The need for such remedies can be determined without referring to matters such as the qualifications of a particular employee. On the other hand, in a private, non-class disparate treatment case, the plaintiff seeks to remedy individual harm. Accordingly, the relief typically sought involves reinstatement, hiring, back-pay, damages, etc. Such remedies typically require the examination of the circumstances surrounding a single employment action involving the plaintiff.

In sum, because the Supreme Court has never applied the *Teamsters* method of proof in a private, non-class action for employment discrimination, and because the nature of the proof and remedies in class and government pattern or practice actions differs vis-a-vis private, non-class actions, we decline to give individual plaintiffs a pattern or practice cause of action or allow them to use the *Teamsters* method of proof.

The relevant case law on the subject supports our conclusion. In *Scarlett v. Seaboard Coast Line R.R.,* 676 F.2d 1043 (5th Cir.1982), the Fifth Circuit rejected the plaintiffs' suggestion that they could use evidence of systematic discrimination *alone* to prove instances of individual discrimination, reasoning that individuals proceeding on circumstantial evidence of discrimination under Title VII must prove the elements of a discriminatory hiring claim as set forth in *McDonnell Douglas. See id.* at 1053. De-

spite evidence of a pattern or practice of discrimination, the court of appeals held that the plaintiffs did not have a claim because they had failed to prove all the elements of an individual claim. *See id.* Later, in *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207 (5th Cir.1995), the Fifth Circuit stated, in the context of a private, non-class action suit, that "[a] 'pattern or practice' claim is not a separate cause of action, but merely another method by which disparate treatment can be shown." *Id.* at 1219. *See also Babrocky v. Jewel Food Co.*, 773 F.2d 857, 866–67 n. 6 (7th Cir.1985) ("Plaintiffs' use of 'pattern-or-practice' language ... seems to be misplaced, since such suits, by their very nature, involve claims of classwide discrimination, and the five plaintiffs, while attacking policies that would have affected all of Jewel's women employees as a class, have stated only their individual claims, not a class action.").

*Cox* and *Davis v. Califano*, 613 F.2d 957 (D.C.Cir.1979), cases cited by the Plaintiffs, are not in conflict with our holding. In *Cox,* the district court decertified the class, but nevertheless tried the individual plaintiffs' pattern or practice claims. *See Cox,* 784 F.2d at 1558. On appeal, the Eleventh Circuit approved of the pattern or practice claims, but only after it held that the district court had erroneously decertified the class. *See id.* at 1558–60. Thus, the pattern or practice claims in *Cox* were appropriately brought in the context of a class action case. *Cox* does not, however, stand for the proposition that individual plaintiffs may bring pattern or practice claims.

In *Davis,* the District of Columbia Circuit stated that "[s]tatistical proof may alone be used, without presentation of specific instances of discrimination, to establish a *prima facie* case of employment discrimination." *Davis,* 613 F.2d at 962. However, the court remanded the case for determination of whether the employee was denied promotion for lawful reasons and, presumably, for determination whether those reasons were merely pretextual. *See id.* at 966. Although we disagree with *Davis* that statistical evidence alone may be used to establish a *prima facie* case of employment discrimination,

*see Carmichael,* 738 F.2d at 1131–32, *Davis* is consistent with our conclusion that private, non-class actions alleging employment discrimination would still follow the *McDonnell Douglas* proof scheme. "Even *Davis* ... recognizes that once statistics have established a pattern of discrimination, each individual plaintiff must still establish that he has been denied an employment benefit in order to recover for particularized injuries." *Id.* at 1132 (internal alterations, ellipses and quotation marks omitted).

Because the Plaintiffs cannot avail themselves of the *Teamsters* method of proof, and because they do not have direct evidence of discrimination, we now turn to consider whether they established their disparate treatment claims under the *McDonnell Douglas* method of proof. We have carefully examined the evidence in the record and conclude that Plaintiffs Spencer, N. Smith, P. Smith, and Fleming failed to establish a *prima facie* case of discrimination under that method of proof. Additionally, S. Smith failed to establish a *prima facie* case with respect to one of her two separate claims. Spencer alleged she was twice passed over for Maintenance Coordinator because of her race. However, she did not present sufficient evidence that she applied for the position, or that she had the minimum qualifications necessary for the position. Both N. Smith and P. Smith alleged they were denied promotions to Customer Service Supervisor due to their race. However, they both failed to prove they were qualified for the position because neither had ever served as Customer Service Assistant Supervisor as Circuit City required. Fleming alleged he was denied a promotion to Real Estate Relocation Coordinator in the Real Estate Department because of his race. However, he failed to prove he was qualified for the position because he never obtained his real estate license as Circuit City required for that position. No reasonable evidence was introduced showing that the licensing requirement was imposed as a pretext for racial discrimination. S. Smith alleged she was discriminatorily passed over for promotion to Division Accounting Analyst. However, the record is clear that she voluntarily withdrew her application and, thus, did not apply for the posi-

tion. There is no indication it was futile to apply or that Circuit City somehow prevented her from applying. We, therefore, affirm the grant of summary judgment and judgment as a matter of law against these Plaintiffs.

As for Stokes' claim and S. Smith's remaining claim, even if they established a *prima facie* case, we conclude below that they failed to demonstrate that Circuit City's articulated reasons for passing them up for promotion were pretextual. Stokes alleged that Circuit City failed to promote him to a position of Supervisor in the Merchandise Payables Department because of his race. Circuit City articulated that Kevin Gremer was selected for the position because he was more qualified than the other applicants. Critically, while Stokes offered evidence of his qualifications, including his experience as a Specialist in the Merchandise Payables Department, he failed to offer any evidence that his qualifications were superior to Gremer's qualifications. Indeed, Stokes fails to offer any evidence of Gremer's qualifications or lack thereof. The mere assertion that Stokes was more qualified than Gremer is insufficient to establish pretext. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that plaintiff can not rely on conclusory allegations to create factual dispute warranting trial); *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456 (4th Cir.1989) ("[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.").

S. Smith alleged she was passed over for promotion to Treasury Analyst because of her race. The job posting stated that the Treasury Department was "seeking a highly motivated and achievement-oriented team player with excellent communication and organizational skills." (J.A. 500). In addition, "[s]trong analytical and decision-making skills [were] essential" for the position. *Id.* After interviewing S. Smith, the promoter, Shelly Steadman, found that S. Smith's position as Specialist in the Merchandise Payables Department had not prepared her for the position of analyst in the Treasury Department. In addition, Steadman felt that S. Smith did not communicate with enough assertiveness. Steadman interviewed two other applicants—one white and one African–American—but felt that neither of them possessed the abilities needed for the position, either. After failing to fill the position, Steadman hired Janet Klingenburg as a temporary employee to prepare some reports that were in urgent need of completion. Klingenburg had a degree in accounting and was in the process of getting her accreditation as a Certified Public Accountant (CPA). She had been working as an actuary and, thus, possessed many of the analytical skills needed for the Treasury Analyst position. After preparing the report in a manner Circuit City described as "excellent," and demonstrating her assertiveness and communication, analytic and computer skills, Circuit City offered Klingenburg the Treasury Analyst position.

Circuit City stated that Klingenburg received the Treasury Analyst position because she was more qualified than S. Smith. S. Smith's response was that: (1) Klingenburg was new to Circuit City and, thus, not familiar with the Treasury Department; (2) CPA certification was not one of the posted job requirements; and (3)"assertiveness" was merely a subjective qualification used to discriminate against her because of her race. These responses did not sufficiently demonstrate that Circuit City's articulated reasons for selecting Klingenburg were pretextual. First, the job posting did not require familiarity with the Treasury Department, so it was not inappropriate to hire from outside Circuit City. Second, although the position did not require CPA certification, the fact that Klingenburg was seeking such certification demonstrated that she was a "highly motivated and achievement-oriented" person as the job posting requested. (J.A. 500). Finally, assertiveness is an inherent aspect of "excellent communication ... and decision-making skills." *Id.* We therefore conclude that S. Smith failed to demonstrate that Circuit City's articulated reasons for rejecting her in favor of Klingenburg were merely pretextual.

Although a plaintiff in a Title VII action may sometimes be able to use statistical evidence of a pattern or practice of discrimination to help establish pretext, this is not such a case. Dr. Harless' statistical analysis of promotions at Circuit City failed to adequately control for factors other than race that could account for the disparity in promotions. One notable omission from Harless' study was the factor that educational level had on promotions at Circuit City. Even if a given educational level was not required for all positions at Circuit City, the record is clear—and common sense dictates—that for many positions educational background was crucial. However, the evidence in this case showed that, while fifty-five percent of HQ employees had college degrees, only thirty-three percent of Circuit City's African–American HQ employees were college graduates. Despite such a large disparity in the educational levels of employees at Circuit City's HQ, Harless failed to consider how educational level affected promotions. We conclude that the failure to consider this factor is sufficiently serious so as to weaken the statistical study's probativeness. *See Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (Brennan, J., concurring in part, adopted by the full Court).

In sum, we affirm the grant of summary judgment against S. Smith, Spencer and N. Smith, and affirm the grant of judgment as a matter of law against Stokes, Fleming and P. Smith.[7]

## IV

■ Next, Circuit City complains that several actions taken by the district court in managing discovery precluded Circuit City from establishing an effective defense. We disagree. We review a district court's actions in managing discovery for abuse of discretion. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 929 (4th Cir.1995).

## A

■ After the district court certified the class action, the parties moved for a clarification of the circumstances under which Circuit City could communicate directly with its African–American employees and former employees. The district court entered an order on May 31, 1996, limiting Circuit City's communications with African–American employees to non-litigation related matters, and prohibiting all other communications except with prior consent of class counsel or the district court. The order also prohibited discovery of class members other than the named Plaintiffs and those class members whom the Plaintiffs intended to call as witnesses at trial. The basis for the district court's limitations was Virginia Code of Professional Responsibility Disciplinary Rule 7–103, which prohibits attorneys from communicating with opposing parties except through opposing counsel. Circuit City complains that this limitation effectively barred Circuit City from communicating with African–American employees who wished to contradict the Plaintiffs' assertions, including employees who wanted to initiate the communication.

Although the district court's order limited *ex parte* communications between Circuit City and its African–American employees at HQ, the order also indicated that, if Circuit City wished to communicate with class members outside the given limitations, Circuit City could apply to the district court for permission to do so. Circuit City merely had to justify why the communication should be exempt from Rule 7–103. The record shows that Circuit City made several such motions, and that the district court readily granted the motions when Circuit City explained why it was necessary to do so. The district court did not, however, grant those motions when Circuit City failed to outline a sufficiently important need for an exception to Rule 7–103.

---

7. Circuit City argues that several errors in the district court's instructions necessitate reversal of Lowery and Peterson's individual discrimination claims. Circuit City also argues there was insufficient evidence for the jury to find in favor of Lowery and Peterson on their individual claims of discrimination. We have thoroughly reviewed these assignments of error and find them to be without merit. Accordingly, we affirm the district court's judgment with respect to Lowery and Peterson.

Circuit City points to no particular denial it alleges was erroneous, nor to any particular employee with whom it needed to communicate in order to establish an effective defense. Rather, Circuit City merely complains it was prohibited from communicating with any employee it wished. If there were employees with whom Circuit City needed to communicate, the procedures were available for Circuit City to gain permission to do so. The fact that Circuit City failed to utilize those procedures does not mean that the district court's limitations on *ex parte* communications precluded Circuit City from establishing an effective defense. Furthermore, because Circuit City has failed to identify any prejudice which resulted from the district court's limitations on communications, any error in imposing those limitations was harmless.

### B

■■■ Circuit City also claims it was precluded from establishing an effective defense because the district court refused to compel the discovery of certain information used by Plaintiffs' statistical expert, Dr. Harless. Circuit City wished to review the methods, data, sources, computer programs, data runs, and codes that Dr. Harless used in performing his statistical analysis of Circuit City's promotion decisions. In response to Circuit City's motion to compel disclosure of this information, the Plaintiffs demonstrated that the data runs, computer programs and codes used by Dr. Harless were produced and developed by other non-testifying consultants retained by the Plaintiffs. Because Circuit City did not demonstrate exceptional circumstances, the district court denied Circuit City's motion to compel discovery of this information. We hold that the district court did not abuse its discretion in refusing to compel this discovery.

Federal Rule of Civil Procedure 26(b) allows discovery of information held by non-testifying experts only upon a "showing of exceptional circumstances under which it is

impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." Fed.R.Civ.P. 26(b)(4)(B). Circuit City directs us to no place in the record where it made such a showing and, in any event, the record demonstrates that Circuit City was able to obtain sufficient information by other means. Harless submitted a detailed expert report as required by the rules, setting forth each of his opinions and providing supporting reasons and exhibits. Circuit City was able to thoroughly examine Harless during his deposition about the bases of, and the methods used for, his analysis. In addition, Circuit City's statistical experts, Drs. Haworth and Kolesar, examined and refuted Dr. Harless' analysis. Given these facts, we cannot conclude the district court abused its "substantial discretion in managing discovery" by denying Circuit City access to this information. *See Lone Star Steakhouse*, 43 F.3d at 929.

In summary, we hold that the district court's limitations on communication with class members[8] and its refusal to compel discovery of Dr. Harless' data runs, computer programs, codes, etc., did not preclude Circuit City from establishing an effective defense.

### V

Circuit City next argues that the district court erred in submitting the issue of punitive damages to the jury. We agree.

■■■ A plaintiff who brings a successful action under 42 U.S.C. § 1981 is entitled to equitable relief, compensatory damages and, "under certain circumstances," punitive damages.[9] *Stephens v. South Atlantic Canners, Inc.*, 848 F.2d 484, 489 (4th Cir.1988) (citing *Johnson v. Railway Express Agency*, 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)). However, not every action under § 1981 warrants an award of punitive damages. *See id.* Punitive damages are only recoverable for conduct exhibiting "malice, an evil motive, or recklessness or callous

---

8. The class was not decertified until the beginning of the trial.

9. A plaintiff that successfully brings an action for violations of both § 1981 and Title VII may only recover damages under § 1981. *See* 42 U.S.C. § 1981a(a)(1).

indifference to a federally protected right." *Id.* (citing *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). It is an "extraordinary remedy," designed to punish and deter "particularly egregious conduct." *Stephens,* 848 F.2d at 489 (citing *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 268, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)). "Although any form of discrimination constitutes reprehensible and abhorrent conduct, not every lawsuit under § 1981 calls for submission of this extraordinary remedy to a jury." *Id.* at 489–90.

■ In our view, there is simply insufficient evidence in the record to conclude that Circuit City's conduct toward Lowery and Peterson was so egregious that it was appropriate to submit the issue of punitive damages to the jury. The record is clear that Lowery and Peterson had problems that, at least partially, led to their being passed up for promotion. In light of this evidence, the extraordinary remedy of punitive damages was not appropriate, notwithstanding the jury's finding that Circuit City did not promote Lowery and Peterson because of their race. We conclude that the district court erred in submitting this issue to the jury and, consequently, vacate the award of punitive damages.

## VI

■ Circuit City next complains of the injunction imposed by the district court, arguing the injunction is impermissibly overbroad. We review the district court's grant of a permanent injunction for abuse of discretion. *See Lone Star Steakhouse,* 43 F.3d at 939. As we explain below, we affirm the portions of the injunction contained in Section B that relate to Lowery. However, because we conclude that the remaining portions of the injunction inappropriately grant what amounts to class-wide relief, we hold that the district court abused its discretion in granting that relief and vacate those portions.

■ We have explained that the standard to be applied by the courts of this circuit in determining the appropriate remedy for racial discrimination is that the plaintiff should be placed in as near a position as possible to where he/she would have been now had the discrimination not occurred. *See Pecker v. Heckler,* 801 F.2d 709, 711 (4th Cir.1986). Being equitable relief, an injunction should be no broader than necessary to achieve its desired goals. *See Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). Moreover, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* (citing *Yamasaki,* 442 U.S. at 702, 99 S.Ct. 2545). Ordinarily, class-wide relief for disparate treatment discrimination is appropriate only where there is a properly certified class, *see Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 361 (1st Cir.1989), although occasionally individual relief equates to classwide relief, *see, e.g., Thomas v. Washington County Sch. Bd.,* 915 F.2d 922, 925–26 (4th Cir.1990) (directing the district court to fashion what amounted to class-wide injunctive relief in a case where an individual plaintiff proved that the employer's hiring practices had a disparate impact on minorities). For several reasons, the district court's injunction violates these principles.

■ First, although the district court appropriately decertified the class action, the provisions of the injunction grant class-wide remedies. The injunction requires Circuit City to promote all persons at HQ without regard to their race, and requires Circuit City to set up a Department of Diversity Management and revise its program of promoting employees. To ensure that the provisions of the injunction are carried out, it includes labyrinthine provisions for reporting and enforcement. Many aspects of the new programs are subject to Plaintiffs' approval, for which Plaintiffs' counsel may apply quarterly for fees and expenses incurred in the monitoring and enforcement of the order. Oversight by the Plaintiffs and the district court would occur for at least five years, and possibly longer if it was deemed necessary to carry out the purposes of the injunction. Such sweeping remedies far surpass those needed—and are far more burdensome than

needed—to provide the prevailing Plaintiffs with complete relief.

■ Second, the Director of the Department of Diversity Management is required to establish a career development and mentoring program for all African–American employees. Not only is this class-wide relief, but the record clearly shows that minorities other than just African–Americans are also employed by Circuit City. Third, the district court admits that the breadth of its injunction was due to the verdict in favor of the Plaintiffs on the pattern or practice claim. Because, as we hold above, individuals may not bring a claim of pattern or practice discrimination, this "claim" cannot support an injunction which grants such broad and sweeping relief.

■ Fourth, the order essentially enjoins Circuit City from committing further violations of federal civil rights laws. This is the sort of go-thy-way-and-sin-no-more provision which we invalidated in *Davis v. Richmond, Fredericksburg & Potomac R.R.*, 803 F.2d 1322 (4th Cir.1986). The district court in that case enjoined the employer from "committing further violations of Title VII." *Id.* at 1328. We held that such an injunction impermissibly subjects a defendant to contempt proceedings for conduct unlike and unrelated to the violation with which it was originally charged. *See id.*

■ Fifth, the injunction permanently enjoins Circuit City from taking "any adverse employment action against any African American employee." (J.A. 772). On its face, therefore, the injunction would prevent Circuit City from taking an adverse employment action against an African–American employee, even if the employee indisputably merited the adverse action and the action was undeniably nondiscriminatory.

■ The injunction's provisions in Section B relating to Lowery, on the other hand, are broad enough to provide her with complete relief without being overly burdensome or expansive. These provisions require Circuit City to promote Lowery to the position of Supervisor of Management Recruiting or an equivalent position, and to pay her the difference in salary between what she earned and what she would have earned had she been appropriately promoted. In other words, these provisions place Lowery in as near a position as possible to where she would be now had the discrimination not occurred. *See Pecker*, 801 F.2d at 711. We, therefore, affirm the provisions in Section B of the injunction relating to Lowery, but vacate all other portions of the district court's injunction. We also affirm the district court's January 7, 1998 order granting Lowery's motion to compel Circuit City's compliance with Section B of the injunction and awarding Lowery her reasonable attorneys' fees and costs incurred in connection with that motion to be subsequently determined.

## VII

■ Finally, Circuit City argued that the district court erroneously awarded in general the Plaintiffs attorneys' fees and costs. We review an award of costs and attorneys' fees for abuse of discretion. *See Reich v. Walter W. King Plumbing & Heating Contractor, Inc.*, 98 F.3d 147, 151 (4th Cir.1996) (citing *Pierce v. Underwood*, 487 U.S. 552, 557–63, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).

■ Our court has recognized that the most critical factor in calculating a reasonable fee award is the degree of success obtained. *See McDonnell v. Miller Oil Co.*, 134 F.3d 638, 641 (4th Cir.1998) (quoting *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933). When the plaintiffs have achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. *See id.* (quoting *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933).

■ Here, the district court justified its award of full attorneys' fees and costs on the Plaintiffs' success on their pattern or practice claim. However, because we hold above that individual plaintiffs may not bring a claim for pattern or practice discrimination, the jury's finding here cannot support a recovery of attorneys' fees for those Plaintiffs that did not otherwise succeed in this action. Furthermore, viewing the case as a whole, we conclude that the Plaintiffs in fact achieved a

very low degree of success. The Plaintiffs brought this suit as a class action, but the district court appropriately decertified the class action at the beginning of trial. The suit originally involved fifty claims filed by eleven Plaintiffs, but only fifteen claims of three Plaintiffs survived motions for dismissal, summary judgment and judgment as a matter of law. Of the fifty claims filed, the Plaintiffs prevailed on only three. In all, the Plaintiffs recovered only $16,700 in compensatory damages.

In light of the low degree of success the Plaintiffs enjoyed, we hold that district court abused its discretion in awarding the Plaintiffs all of their accrued attorneys' fees and costs amounting to nearly $4 million. *See McDonnell,* 134 F.3d at 641. We, therefore, vacate the award of attorneys' fees and remand to the district court for redetermination in light of this opinion.

### VIII

In summary, for the reasons stated above, we: (1) affirm the district court's order decertifying the class action; (2) vacate the judgment entered on the claim for pattern or practice of discrimination; (3) affirm the grant of summary judgment against N. Smith, S. Smith, and Spencer, and the grant of judgment as a matter of law against P. Smith, Fleming and Stokes; (4) affirm the verdicts in favor of Lowery and Peterson; (5) vacate the award of punitive damages; (6) affirm the provisions of the injunction relating to Lowery in Section B, but vacate all other provisions; (7) affirm the district court's grant of Lowery's motion to compel compliance with Section B of the injunction and award of reasonable attorneys' fees and costs in connection with that motion; and (8) vacate the general award of attorneys' fees and costs, and remand with instructions to redetermine costs and fees in a manner consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.*