**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GRETA SEMSROTH; KIM
WAREHIME; and SARA VOYLES,
on behalf of themselves and all others
similarly situated,

     Plaintiffs-Appellants,

v.

CITY OF WICHITA; and CHIEF
NORMAN WILLIAMS, individually
and in his official capacity,

     Defendants-Appellees.

No. 07-3155
(D.C. No. 6:04-CV-01245-MLB)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO, HOLLOWAY,** and **EBEL**, Circuit Judges.

Plaintiffs-Appellants appeal the district court's decision to grant summary

judgment to Defendants-Appellees on their claims brought pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. We have

jurisdiction under 28 U.S.C. § 1291. We AFFIRM in part, REVERSE in part, and

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

REMAND.

## I.

### A.    Factual Background

Officer Greta Semsroth, Officer Sara Voyles, and Officer Kim Warehime (collectively, the "Officers") have all served as officers with the Wichita Police Department (the "Department") for at least the last seven years.[1]  The Officers alleged that during their tenure with the Department, their supervisors discriminated and retaliated against them by subjecting them to disparate treatment, disparate impact, retaliation, and a hostile work environment, all in violation of Title VII.   Given the distinct nature of their claims, we briefly explain each officer's allegations separately.[2]  Due to Title VII's timely filing requirements discussed below, we outline here only those allegations that involve events that fall within 300 days from when each officer filed her EEOC intake questionnaire.

---

[1] The district court dismissed Officer Heather Plush's Title VII claims for failure to exhaust administrative remedies.  The Officers do not appeal this decision.

[2] The district court's thoughtful and comprehensive memorandum and order discusses the facts of this case in great detail.  See Semsroth v. City of Wichita, No. 04-1245-MLB, 2007 WL 1246223 (D. Kan. Apr. 27, 2007).  Accordingly, we will not repeat the district court's efforts and offer only a brief summary of the facts here.

### i. Officer Semsroth

Officer Semsroth alleged that her superior officers and colleagues at the Department repeatedly subjected her to sexual discrimination during her tenure with the Department. Six of Officer Semsroth's allegations involved conduct that fell within the 300-day window. First, she alleged that the Department failed to discipline other officers for referring to her in a derogatory fashion. Second, she alleged that other officers failed to respond to her requests for back up because of her gender. Third, she alleged that several supervisory officers "interrogated" her after several female officers held a women's luncheon to discuss their concerns regarding the Department. Fourth, she alleged that the Department transferred her to a less desirable beat assignment in retaliation for meeting with the city's Affirmative Action Administrator. Fifth, she alleged that the Department retaliated against her by making negative notations in her personnel file. Lastly, she alleged that the Department refused to display an EEOC poster in spite of her several requests.

### ii. Officer Voyles

Officer Voyles also alleged that her superior officers and colleagues at the Department subjected her to sexual discrimination. Two of those allegations involved conduct that occurred during the 300-day window. First, Voyles alleged that during her pregnancy, Lieutenant Bohannon made numerous comments regarding her weight and eating habits. Second, Voyles alleged that she was

3

verbally reprimanded in front of media personnel after she complained about Lieutenant Bohannon's conduct.

### iii. Officer Warehime

Officer Warehime made similar allegations of sexual discrimination in her EEOC intake questionnaire. Three of those allegations involved conduct that occurred during the 300-day window. First, Officer Warehime alleged that the Department subjected her to disparate disciplinary treatment arising from a charge of conduct unbecoming of an officer. Second, she alleged that three lieutenants interrogated her regarding a "women's luncheon" attended by female officers. Third, she alleged that the Department denied her a temporary rotation after her attorney sent the Department a letter regarding her concerns about sexual discrimination.

### B. Procedural Background

After filing their intake questionnaires with the EEOC, the Officers filed a class action in the United States District Court for the District of Kansas against the defendants. The district court denied the plaintiffs' motion for class certification and dismissed the claims against Chief Williams in his official capacity.[3] The district court then granted the defendants summary judgment on the plaintiffs' individual Title VII claims for disparate treatment, hostile work

---

[3] The Officers do not appeal the district court's decision to deny their class certification motion.

environment, and disparate impact.  The plaintiffs now appeal that final decision.[4]

## II.

We review the district court's grant of summary judgment de novo.  Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1163 (10th Cir. 2007).  Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  During our de novo review, we view the evidence in the record in the light most favorable to the nonmoving party, in this case, the Officers.  Jones v. U.P.S., Inc., 502 F.3d 1176, 1183 (10th Cir. 2007).

## A.

Before considering the merits, we must first determine whether the Officers complied with three general prerequisites to bring a civil suit pursuant to Title VII.  Prior to filing such a suit in federal court, plaintiffs must administratively exhaust their claims in a timely fashion by filing a charge with the EEOC.  Montes, 497 F.3d at 1163.  We address this requirement in three steps.  First, we analyze whether the document each plaintiff filed with the EEOC constitutes a charge.  Second, we determine which allegations included in the charge, if any,

---

[4] The plaintiffs also pursued a 42 U.S.C. § 1983 claim against Chief Williams in his personal capacity.  The district court granted Chief Williams summary judgment on this claim, and on appeal, the plaintiffs expressly waived any argument on that claim.  Accordingly, we do not address this issue.

are timely. Third, we determine whether the federal claims are included within the scope of those timely allegations.

### i. EEOC charge

While the contours of the requirement to file a charge may appear straightforward, we have not resolved what type of document constitutes a charge for the purposes of Title VII. The Officers contend that their EEOC intake questionnaires qualify as charge documents because they constitute requests for the EEOC to take action on the alleged discrimination. We partially agree. As discussed more completely below, Officer Semsroth and Officer Voyles took sufficient steps to reasonably indicate that they sought the EEOC to take action on their behalf based on the allegations included in their intake questionnaires. Accordingly, these documents constitute charges. The record, however, does not indicate that Officer Warehime took similar steps, and therefore, we dismiss her appeal because she did not file a charge with the EEOC.

Section 2000e-5(b) provides the EEOC with broad discretion to determine the information necessary in a charge. See 42 U.S.C. § 2000e-5(b); Jones, 502 F.3d at 1183–84. Pursuant to this discretion, the EEOC regulations dictate that a charge should contain the following information: (i) the name, address, and telephone number of the person bringing the charge; (ii) the name and address of the person the charge is brought against; (iii) a statement of the facts underlying the allegations; (iv) the number of employees employed by the relevant employer;

6

and (v) a statement addressing whether charges have been brought before a state or local employment practices agency.  29 C.F.R. § 1601.12(a).  The regulation also dictates, however, that strict compliance with these requirements is not necessary so long as the charge the Commission receives is "a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of."  Id. § 1601.12(b); see also Jones, 502 F.3d at 1184.

Against a similar regulatory backdrop, the Supreme Court recently addressed what constitutes a charge for the purposes of the Age Discrimination in Employment Act (ADEA).  See Federal Express Corp. v. Holowecki, 128 S. Ct. 1147 (2008).[5]  The Court held that a document constitutes a charge if it (i) provides the minimum information the regulations require, and (ii) can "be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and employee."  Id. at 1157–58.  Importantly, the Court explained that these requirements would allow the EEOC to fulfill its dual role of "enforcing antidiscrimination laws and disseminating information about those laws to the public."  Id. at 1157.  Moreover, the Court rejected an interpretation requiring

_____

[5] While the Holowecki Court addressed the ADEA, we cite cases addressing the ADEA's filing requirements in the Title VII context because "the filing provisions of the ADEA and Title VII are virtually in haec verba, the former having been patterned after the latter."  Montes, 497 F.3d at 1164 n.6 (internal quotation marks omitted) (quoting E.E.O.C. v. Commercial Office Prods. Co., 486 U.S. 107, 123–24 (1988)).

only the minimal information mandated by the regulations because such a minimal standard would likely discourage individuals from seeking information from the EEOC due to concerns that the Commission would treat the information requests as charges. Id.

Before Holowecki, we had held that a document filed with the EEOC constitutes a charge where: (i) the document satisfies the requirements of § 1601.12; (ii) the evidence demonstrated that the complainant sought to activate the EEOC's administrative process; and (iii) the EEOC treated the document as a charge. Jones, 502 F.3d at 1183. The Holowecki Court's interpretation of what constitutes a charge, however, requires us to clarify two points regarding the factors discussed in Jones. With respect to the second factor, we must now evaluate whether a filing constitutes a complainant's request for remedial action from an objective viewpoint only. See Holowecki, 128 S. Ct. at 1158 ("[T]he filing must be examined from the standpoint of an objective observer to determine whether, by a reasonable construction of its terms, the filer requests the agency to activate its machinery and remedial processes . . . ."). With respect to the third factor, we now make plain that we do not require evidence that the EEOC actually treated a filing as a charge to construe that document as such. See id. at 1158–59. Instead, the EEOC's subsequent conduct merely informs our determination regarding whether the document can reasonably be construed as a request for agency action.

With this standard in mind, we turn to consider whether each plaintiff filed a charge with the EEOC. The Officers each filed separate intake questionnaires with the EEOC in March 2004. These questionnaires are similarly formatted and contain all five types of information required by 29 C.F.R. § 1601.12. Standing alone, these questionnaires cannot reasonably be construed as "a request for the agency to take remedial action" because they relate only factual information about the Officers' allegations of discrimination and make no requests of the agency. See, e.g., Holowecki, 128 S. Ct. at 1159–60 (holding that an intake questionnaire constituted a charge because of an attached affidavit that stated "[p]lease force Federal Express to end their age discrimination plan so we can finish out our careers absent the unfairness and hostile work environment . . . ."). In addition, the language of the intake questionnaire form does not suggest that an employee requests action against her employer simply by filling out the form. Instead, the form merely requests information using statements like: "Please tell us the harm that you experienced" and "Why do you believe that your harm was for the [discriminatory] reason(s) stated in the previous question?"

Our inquiry, however, does not end with the intake questionnaire. After submitting the questionnaires to the EEOC, each plaintiff received one or two letters from the EEOC. These letters informed the Officers that they had not filed charges as a result of the questionnaires and directed the Officers to take additional steps, including contacting the EEOC, if they wished to file a charge.

9

The letters also indicated that if the Officers elected to file a charge, "it is likely the case would immediately be closed. A Dismissal/Right-to-Sue document would then be issued to you." The record indicates that only two of the Officers (Semsroth and Voyles) received Right-to-Sue letters.

Given the discourse in the letters from the EEOC as well as the existence of the Right-to-Sue letters, we conclude that as a result of their subsequent actions, Officer Semsroth's and Officer Voyles's intake questionnaires reasonably constitute charges for the purposes of Title VII. The letters from the EEOC indicate that the Officers needed to take additional steps to demonstrate the requisite desire to start the EEOC administrative process and that if they did so, the EEOC would likely close their cases and issue Right-to-Sue letters. The presence of the Right-to-Sue letters suggests that Semsroth and Voyles in fact took the affirmative steps necessary to signal their desire to the EEOC to start its administrative process. We stress that the EEOC's subsequent conduct is not a necessary prerequisite for filing a charge. Here, we consider the EEOC's subsequent conduct only as evidence that Semsroth and Voyles must have contacted the EEOC subsequent to filing the intake questionnaire to request EEOC action, because the EEOC had advised these two plaintiffs that it would not issue right-to-sue letters to them in the absence of express requests for action. Accordingly, we conclude that Semsroth and Voyles filed charges with the EEOC.

The lack of a Right-to-Sue letter for Officer Warehime, on the other hand,

10

suggests that Officer Warehime did not take the steps necessary to demonstrate a desire to start the EEOC process. The EEOC letter to Officer Warehime notes that Warehime met with an EEOC Senior Investigator, but nothing in the record suggests that Warehime requested that the EEOC start its process during that interview. Without additional evidence, Officer Warehime's intake questionnaire cannot be construed as a request for the EEOC to take action, and accordingly, we conclude that Officer Warehime failed to file a charge with the EEOC. We therefore dismiss her appeal.[6]

### ii. Timely allegations

A plaintiff's allegation is timely if she files her EEOC charge within 300 days of the alleged unlawful employment practice.[7] Croy v. Cobe Labs., Inc., 345

[6] The Officers' Supplemental Brief contends that a charge filed with the EEOC by any of the Officers satisfies the charge requirements of Title VII via the "single filing rule." The single filing rule, however, does not save Officer Warehime's claims because the Officers' allegations of discrimination—involving different superior officers and different incidents—demonstrate that they are not similarly situated. See, e.g., Foster v. Ruhrpumpen, Inc., 365 F.3d 1191, 1198–99 (10th Cir. 2004) (applying the "single filing rule" where, inter alia, the plaintiffs were similarly situated because their age discrimination claims all involved the same termination event). Although both Officer Warehime and Officer Semsroth alleged they were interrogated regarding women's luncheons, those interrogations were separated by three months and there is no indication that the same superior officers conducted both interrogations. Thus, the single filing rule does not apply.

[7] We have held that Kansas is a "deferral" state for the purposes of Title VII. See Brown v. Unified Sch. Dist. 501, Topeka Pub. Schs., 465 F.3d 1184, 1186 (10th Cir. 2006). Accordingly, pursuant to § 2000e-5(e)(1), the plaintiffs had to file their EEOC charges within 300 (rather than 180) days. 42 U.S.C.

(continued...)

11

F.3d 1199, 1202 (10th Cir. 2003).  The Officers contend, however, that the district court wrongly applied the 300-day time limit because the continuing violations doctrine enables courts to consider allegations involving conduct that occurred beyond that period for purposes of the pattern or practice method of proof.  In the past, we have noted that the continuing violations doctrine is viable only for hostile work environment claims, but the Morgan Court expressly left open whether the continuing violations doctrine applied to the pattern or practice method of proof.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 n.9 (2002) ("We have no occasion here to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants as none are at issue here.").  Since Morgan, we have only applied the continuing violations doctrine to hostile work environment claims; however, we have not had the occasion to address the pattern or practice issue left open by the Morgan Court.  We now conclude that the pattern or practice method of proof is available only to the government and class actions.  Accordingly, we again decline to address whether the continuing violations doctrine applies to the pattern or practice method of proof.

The pattern-or-practice method of proving discrimination has its origins in 42 U.S.C. § 2000e-6(a), which states that the Attorney General may bring a civil

---

[7](...continued)
§ 2000e-5(e)(1).

action against an employer on behalf of a protected group. To prevail in such an action, the Government must prove that the employer "is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by the subchapter." 42 U.S.C. § 2000e-6(a). In the seminal case on the pattern-or-practice method of proof, the Supreme Court implicitly extended this method of proof to class actions brought by private parties. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 357–60 (1977). The Supreme Court, however, has not extended this method of proof to claims brought by individual plaintiffs. Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 761 (4th Cir. 1998), vacated on other grounds, 527 U.S. 1031 (1999).

The pattern-or-practice method of proof and the method of proof used in a typical Title VII discrimination claim require different steps to prove a claim of discrimination. Pursuant to Teamsters, the pattern-or-practice method of proof involves two stages. At the first stage, the plaintiff must establish the employer's liability by "demonstrat[ing] that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." Teamsters, 431 U.S. at 360. If the plaintiff carries this burden, then the employer may defend its liability by showing that the "[plaintiff's] proof is either inaccurate or insignificant . . . [by] provid[ing] a nondiscriminatory explanation for the apparently discriminatory result." Id. at 360–61 & 360 n.46. If the defendant fails to establish a nondiscriminatory reason, then the second stage requires the

13

court to fashion a proper remedy on the presumption that a violation has occurred. Id. at 361. If the plaintiff does not provide any additional evidence, the court may impose only prospective remedies. Id. If the plaintiff demonstrates that the employer subjected a particular individual to an adverse employment action, that employee may receive damages. Id. at 361–62.

In contrast, a typical Title VII claim resolves issues of proof by relying on the burden-shifting method of proof from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, a plaintiff bears the initial burden and must demonstrate a prima facie case of discrimination in violation of Title VII. Id. at 802. If the plaintiff successfully makes a prima facie claim, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. Id. If the employer carries that burden of production, then the plaintiff must show that the employer's reason is merely a pretext for discrimination. Id. at 804.

Several of our sister circuits, having noted the differences between these two methods of proof, have held that individual, private plaintiffs may not utilize the pattern-or-practice method of proof. For example, in Lowery, the Fourth Circuit distinguished these two methods of proof for two reasons. 158 F.3d at 761–62. First, the court noted that a plaintiff's burden under the pattern-or-practice method requires the plaintiff to prove only the existence of a discriminatory policy rather than all elements of a prima facie case of

14

discrimination. Id. at 761. The court found this difference problematic because the Supreme Court has never allowed an individual plaintiff to shift the burden to the employer without first demonstrating all aspects of a prima facie case. Id. Second, the Fourth Circuit also distinguished these methods of proof based on the available remedies. Id. The court noted that under the pattern-or-practice method, only prospective relief was available, unless the plaintiffs offered additional proof. Id.; see also Teamsters, 431 U.S. at 361. Because of these differences, and because the Supreme Court has never extended the pattern-or-practice method to individual plaintiffs, the court declined to allow individual plaintiffs to make their case using the pattern-or-practice method. Lowery, 158 F.3d at 761.

Other circuits have followed the Fourth Circuit's lead. The Fifth Circuit held that the pattern-or-practice method was inappropriate for individual plaintiffs because the Supreme Court had not extended this method beyond class actions and cases brought by the Government. Celestine v. Petroleos de Venezuela SA, 266 F.3d 343, 356 (5th Cir. 2001). The Sixth Circuit largely echoed Lowery when it held that "[w]e subscribe to the rationale that a pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case." Bacon v. Honda of Am. Mfg., Inc., 370 F.3d 565, 575 (6th Cir. 2004). The Seventh Circuit has also cautioned that

15

language typical of the pattern-or-practice method was "misplaced" in an individual Title VII suit.  Babrocky v. Jewel Food Co., 773 F.2d 857, 866 n.6 (7th Cir. 1985).  But see Davis v. Califano, 613 F.2d 957, 963 (D.C. Cir. 1979) (suggesting that the rationale of a pattern or practice claim similarly applies in a cause of action brought by an individual).

In light of the distinctions between the two methods of proof, we agree with the strong majority of our sister circuits.  The disparities between both of these methods of proof and the remedies available demonstrate that the pattern-or-practice method should be reserved for government actions or plaintiffs in class actions to establish the presence of a discriminatory policy, rather than to prove an individual claim.  See Lowery, 158 F.3d at 761 ("The Supreme Court has never applied the Teamsters method of proof in a private, non-class suit charging employment discrimination. Rather, the Court has noted that there is a 'manifest' and 'crucial' difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination.").  Therefore, we hold that individual plaintiffs may not utilize the pattern or practice method of proof in Title VII suits.  Accordingly, only those allegations addressing conduct that occurred within the 300-day window are timely for the purposes of the disparate treatment, disparate impact, and retaliation claims.[8]

---

[8] Due to the applicability of the continuing violations doctrine to hostile
(continued...)

16

In the instant case, several of the Officers' allegations are untimely. Semsroth's EEOC administrative charge includes eight separate claims. Semsroth filed the charge on March 11, 2004, and therefore, the 300-day filing period began on May 16, 2003. Two of Semsroth's allegations—her allegations regarding being passed over for awards and her allegation regarding the picture of an award being placed in her locker—involved conduct that occurred before May 16, 2003, and thus, the district court properly excluded these allegations. The court also properly excluded the last two allegations in Semsroth's EEOC charge because the Officers did not include any mention of them in their response to the defendants' motion for summary judgment, and accordingly, these allegations were not before the district court.[9] Thus, the district court correctly allowed only four of the eight allegations included in Semsroth's administrative charge. These allegations include: (i) the Department retaliated against her by transferring her to a beat assignment with restricted experience and career advancement opportunities; (ii) a supervising officer told her that other officers referred to her as a "bitch" and then failed to discipline those officers; (iii) the Department failed

[8](...continued)
work environment claims, we address which allegations are timely for those claims below.

[9]Plaintiffs arguably raised only one of these two allegations in their complaint, and the pretrial order did not include either allegation. Nor did Plaintiffs specifically address these allegations in their opening brief filed with this court.

17

to take disciplinary action against an officer that failed to give Semsroth proper backup support during an emergency call; and (iv) a supervising officer "interrogated" her regarding a women's only luncheon for female police officers.

Voyles's EEOC charge included five separate allegations. She filed her charge on March 18, 2004, and her 300-day filing period therefore began on May 23, 2003. Three of these allegations involved conduct that occurred prior to May 23, 2003, and thus, are time barred. The district court properly allowed the remaining two allegations: (i) an allegation regarding a supervisor's negative and derogatory comments regarding Voyles's body and eating habits made while Voyles was pregnant; and (ii) an allegation regarding an oral reprimand from a supervisor in front of various media personnel.

### iii.    Scope of exhausted claims

As a final matter on this issue, the Officers contend that the district court erroneously restricted the scope of their exhausted claims. The Officers assert that they exhausted any claim that is "reasonably related" to the allegations made in their EEOC charges. Unfortunately, the Officers cite abrogated case law to make their argument, and in light of more recent precedent, this argument lacks persuasive force.[10] It is now well established that "each discrete [discriminatory]

---

[10] The Officers' argument rests on Ingels v. Thiokol Corp., 42 F.3d 616 (10th Cir. 1994). We abrogated the holding in Ingels, however, after the Supreme Court handed down its decision in Morgan. See Martinez v. Potter, 347 F.3d

(continued...)

18

action constitutes its own unlawful practice for which administrative remedies must be exhausted." Annett v. Univ. of Kan., 371 F.3d 1233, 1238 (10th Cir. 2004) (quotation marks omitted). Here, the district court restricted its analysis to the allegations the Officers exhausted by including them in their EEOC questionnaires, and therefore, we conclude that the district court properly declined to consider the additional allegations the Officers did not include in the EEOC questionnaires.

## B.

Shifting our attention to the merits, the Officers contend that the district court wrongly granted the defendants summary judgment because genuine issues of material fact remain regarding the Officers' Title VII claims. We agree only in part. After reviewing the record and construing the evidence in the light most favorable to the Officers, we conclude that the district court correctly granted the defendants summary judgment on most of the Officers' Title VII claims.[11] But we

---

[10](...continued)
1208, 1210–11 (10th Cir. 2003).

[11] The Officers contend that we must apply a modified McDonnell Douglas burden-shifting framework to take into account the mixed motive approach the Supreme Court addressed in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). We doubt that the Costa Court modified that framework because the Court did not address or cite McDonnell Douglas in that opinion; however, we need not resolve that issue here. Both the McDonnell Douglas and the mixed motive approaches require a demonstration that a discriminatory motive played some role in the employment decision at issue. With two exceptions, the Officers failed to present evidence through any of these methods that a discriminatory motive played a role
(continued...)

19

REVERSE the district court's decision to grant the defendants summary judgment on Officer Semsroth's claims alleging retaliation and a hostile work environment. We, therefore, REMAND those two claims for trial.

### i. Disparate treatment

To establish a prima facie case of disparate treatment, a plaintiff must demonstrate: (i) that she belongs to a protected class; (ii) that she suffered from an adverse employment action; and (iii) that her employer treated similarly situated employees differently. Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005). Adverse employment action includes "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007) (quotation marks omitted) (quoting Hillig v. Rumsfeld, 381 F.3d 1028, 1032–33 (10th Cir. 2004)). In other words, "a mere inconvenience or an alteration of job responsibilities" will not constitute an adverse employment action.[12] Id.

_____

[11](...continued)
in the employment decisions at issue in the case at bar. We specifically address below the mixed-motive theory that applies to retaliation claims. Otherwise, as discussed below, the district court properly granted summary judgment under either approach.

[12] We note, however, that the concept of an adverse employment action differs in the context of Title VII anti-retaliation claims. See Piercy, 480 F.3d at 1203 n.12 (noting that Burlington Northern & Santa Fe Railway v. White, 548 U.S. 53 (2006), modified the contours of adverse employment action only for the
(continued...)

20

(quotation marks omitted) To be similarly situated, employees must "deal with the same supervisor and [be] subject to the same standards governing performance evaluation and discipline." McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006) (quotation marks omitted).

Turning to the instant case, it is clear that the district court properly granted the defendants summary judgment on all the disparate treatment claims.[13] Semsroth's two disparate treatment claims fail to establish a prima facie discrimination claim for two reasons. First, neither event constitutes an adverse employment action. Neither the record nor the Officers' brief indicates what adverse effect, if any, Semsroth's employment suffered due to the lack of disciplinary actions taken against other officers. Second, the record does not indicate that the Department treated Semsroth differently from other officers because Semsroth did not face disciplinary action in similar circumstances.

Voyles also fails to establish a prima facie claim because she did not demonstrate that the reprimand she received constituted an adverse employment

[12](...continued)
purposes of retaliation claims).

[13] For clarity's sake, we list here Semsroth's and Voyles's factual allegations that support their claims of disparate treatment. Semsroth has two actionable claims for disparate treatment relating to discipline: (i) supervisors telling Semsroth that other officers referred to her as a "bitch" and failing to discipline those officers for their comments; and (ii) supervisors failing to discipline a fellow officer for failing to provide backup to Semsroth. Voyles's one actionable claim for disparate disciplinary treatment relates to an oral reprimand from a supervisor in front of various media personnel.

action.  "A written warning <u>may</u> be an adverse employment action only if it effects a significant change in the plaintiff's employment status."  <u>Haynes v. Level 3 Commc'ns, LLC</u>, 456 F.3d 1215, 1224 (10th Cir. 2006).  Here, Voyles presented no evidence that the reprimand affected her status.  Accordingly, summary judgment on the Officers' disparate treatment claims was proper because they did not establish the required elements for a prima facie case.

### ii.     Disparate impact

Unlike a disparate treatment claim, a disparate impact claim does not require a plaintiff to demonstrate intentional discrimination.  <u>Carpenter v. Boeing Co.</u>, 456 F.3d 1183, 1187 (10th Cir. 2006).  Instead, to establish a prima facie claim of disparate impact, a plaintiff must demonstrate that (i) a <u>specific</u> identifiable employment practice or policy caused (ii) a significant disparate impact on a protected group.  <u>Bullington v. United Air Lines, Inc.</u>, 186 F.3d 1301, 1312 (10th Cir. 1999), <u>overruled on other grounds by</u> <u>Morgan</u>, 536 U.S. 101; <u>see also</u> 42 U.S.C. § 2000e-2(k)(1)(A).  This burden is not easily shouldered; a plaintiff "must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack."  <u>Boeing</u>, 456 F.3d at 1193 (quoting <u>Wards Cove Packing Co. v. Atonio</u>, 490 U.S. 642, 657 (1989), <u>superseded by statute on other grounds as recognized in</u> <u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44, 52-53 (2003)).  If the plaintiff successfully bears this burden, then the burden shifts to the defendant "to show that the challenged

22

practice is job related and consistent with business necessity." Bullington, 186 F.3d at 1312. If the defendant satisfies its burden, the final step requires the plaintiff to "suggest an alternative employment practice that serves the employer's legitimate employment goals yet lacks the undesired discriminatory effect." Id.

In the instant case, the Officers object to "excessive subjectivity in promotions, discipline, hiring, and terminations." As noted above, only administratively exhausted claims are actionable. Here, the Officers' EEOC charges do not specifically reference specific employment practices that resulted in disparate impact, nor do they include any factual allegations that would give rise to a reasonable expectation of an administrative investigation for a claim of disparate impact. See Jones, 502 F.3d at 1186 (noting that we determine if a claim is administratively exhausted by analyzing "the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge"). Accordingly, the district court correctly granted defendants summary judgment on the Officers' disparate impact claims.

### iii. Retaliation

Title VII explicitly prohibits retaliation against any employee who brings

charges of discrimination. See 42 U.S.C. § 2000e-3.[14] In this case, only Semsroth exhausted a retaliation claim, alleging the Department retaliated against her for complaining to the Department's affirmative action administrator, Susan Leiker, about the unequal treatment the Department affords female officers. A few weeks after Semsroth raised this complaint, she was transferred to Beat 39. Beat 39 is not an assignment that any officer wants; it is referred to as a "banishment beat." Beat 39 provides diminished opportunities to gain experience and advance one's career because there are few calls on this beat, and there are no calls involving serious crime or high-profile incidents. Beat 39 also provides a more limited opportunity for overtime as compared to most other beats. Usually the Department assigns new officers to Beat 39, or an officer who is being disciplined.

"To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1224-25 (10th Cir. 2008); see also Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 549

---

[14] Section 2000e-3(a) provides:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
42 U.S.C. § 2000e-3(a).

(10th Cir. 1999). First, the plaintiff "may directly show that retaliatory animus played a 'motivating part' in the employment decision." Fye, 516 F.3d at 1225. "If, however, the plaintiff is unable to" make that showing, "she may rely on the familiar three-part McDonnell Douglas framework to prove that the employer's proffered reason for its decision is a pretext for retaliation." Id.; see also Price Waterhouse v. Hopkins, 490 U.S. 228, 247 n.12 (1989) (plurality), superseded in part on other grounds by 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B)); id. at 260 (White, J., concurring). Because Semsroth has established, under a mixed-motive theory, that a genuine issue of material fact exists as to whether retaliation played a motivating part in the Department's decision to transfer her to Beat 39, we need not consider Semsroth's retaliation claim under the McDonnell Douglas burden-shifting analysis.

To establish a mixed-motive claim, the plaintiff must "present[] evidence that directly shows that retaliation played a motivating part in the employment decision at issue."[15] Fye, 516 F.3d at 1226; see also Kelley v. City of Albuquerque, 542 F.3d. 802, 819 n.16 (10th Cir. 2008) (noting "[a]

---

[15]"Once the plaintiff proves that retaliatory animus was a motivating factor, the burden of persuasion shifts to the defendant to prove that it would have taken the same action absent the retaliatory motive." Fye, 516 F.3d at 1225. If the defendant is able to make this showing, the defendant will not be relieved of liability, but the plaintiff's remedies may be limited. See 42 U.S.C. § 2000e-5(g)(2)(B); see also Davey v. Lockheed Martin Corp., 301 F. 3d 1204, 1213-14 (10th Cir. 2002); Medlock, 164 F.3d at 553 n.5.

'mixed-motive' instruction is appropriate only in cases where direct evidence suggests forbidden animus was a motivating factor in the employment decision"). However, a plaintiff can make this showing using either direct or circumstantial evidence. See Fye, 516 F.3d at 1226. The "circumstantial evidence must be tied 'directly' to the retaliatory motive." Id. That is, "[s]uch circumstantial evidence must relate to a retaliatory reason for the employer's action." Id. at 1226-27 (quotation, alteration omitted).

Semsroth has met that burden here with the deposition testimony of Sergeant Wiley. Wiley testified that Semsroth's supervisor, Lieutenant Hanley, in deciding to transfer her to Beat 39, stated that he wanted to "[p]ut her out there, she won't have nothing to complain about." Wiley also indicated that Hanley's decision may have been motivated in part by Semsroth's troubled relationship with her co-workers. A reasonable jury could interpret Hanley's motivation—to insure that Semsroth would have nothing to complain about—as retaliation for the gender discrimination complaints she made to the City's affirmative action administrator, Leiker. See Fye, 516 F.3d at 1227 (considering, at summary judgment stage of litigation, whether reasonable jury could infer a retaliatory motive from the evidence presented). This evidence is, thus, sufficient to create a genuine issue of material fact that precludes summary judgment on this claim. See Thomas v. Denny's, Inc., 111 F.3d 1506, 1512 (10th Cir. 1997) (holding plaintiff presented sufficient evidence in support of his mixed-motive retaliation

26

claim where two witnesses testified that "several people involved in the [challenged] promotion decision process had stated that Mr. Thomas would not be considered for promotion because of his discrimination complaint"); Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1471 n.5 (10th Cir. 1992) (holding plaintiff presented sufficient evidence to support her mixed-motive retaliation claim when warehouse supervisor testified that his supervisor held plaintiff's prior EEOC filing against her and had misrepresented a prior incident to those who decided not to promote plaintiff).

We, therefore, reverse the district court's decision granting defendants summary judgment on Officer Semsroth's retaliation claim and remand that claim to the district court for a trial.

### iv.    Hostile work environment

A plaintiff establishes a Title VII violation if she "proves that 'discrimination based on sex has created a hostile or abusive work environment.'" Equal Employment Opportunity Comm'n v. PVNF, L.L.C., 487 F.3d 790, 798 (10th Cir. 2007) (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 (1986)); see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). In considering whether the Officers asserted a claim of a sexually hostile work environment sufficient to survive summary judgment, we look at "the totality of the circumstances . . . , which is the touchstone of our analysis" of such claims. PVNF, 487 F.3d at 799 (quotation omitted); see also Harris, 510 U.S. at 23;

27

Harsco Corp. v. Renner, 475 F.3d 1179, 1187 (10th Cir. 2007).

> To establish that a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

Harsco Corp., 475 F.3d at 1186 (quotation, alteration omitted). Thus, "[t]o survive summary judgment on a claim alleging a [sexually] hostile work environment, [the Officers] must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and that they were "targeted for harassment" because of their gender. Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007) (quotation omitted).

"A plaintiff does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents of [gender-based] enmity or sporadic [gender-based] slurs. Instead, there must be a steady barrage of opprobrious [gender-based] comments." Id. (quotation omitted). In determining whether the harassment is severe or pervasive, "we consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." Id. (quotation, alteration omitted). "The inquiry is particularly unsuited for summary judgment

28

because it is quintessentially a question of fact." Tademy v. Union Pac. Corp.,

520 F.3d 1149, 1162 (10th Cir. 2008) (quotation omitted).

Both Voyles and Semsroth allege their work environment was sexually

hostile.

### a. Officer Semsroth

Semsroth alleges that her work environment was sexually hostile and thus

violated Title VII. We must start our analysis by determining which of the

allegations Semsroth asserts in support of this claim we can consider. As noted

above, the continuing violation doctrine remains viable for hostile work

environment claims. The Morgan Court made clear that the scope of actionable

claims depended on "whether the acts about which an employee complains are

part of the same actionable hostile work environment practice." 536 U.S. at 120.

To determine whether separate acts are part of the same practice, we look to the

type, frequency, and timing of the acts, as well as to the perpetrator of the acts.

Duncan v. Manager, Dep't of Safety, City & County of Denver, 397 F.3d 1300,

1309 (10th Cir. 2005).

As previously addressed, Semsroth's actionable allegations include the

following: (i) the Department retaliated against her by transferring her to a beat

assignment with restricted experience and career advancement opportunities; (ii) a

supervising officer told her that other officers referred to her as a "bitch" and then

failed to discipline those officers; (iii) the Department failed to take disciplinary

29

action against an officer who failed to give Semsroth proper backup support during an emergency call; and (iv) a supervising officer "interrogated" her regarding a women's-only luncheon for female police officers. In addition, however, Semsroth makes several other allegations that are sufficiently related to these actionable claims that they can be considered part of the same unlawful employment practice.

First, Semsroth testified in her deposition that Sergeant Watts admonished Semsroth to "let [her] hair down and go out and have beers with the guys." This allegation is sufficiently related to Semsroth's actionable claim that Sergeant Watts, along with Captain Tabor, Lieutenant Hanley, and Sergeant Chambers, failed to discipline Officer Nixon when he did not provide backup for Semsroth in October 2003. And it was Sergeant Watts who, along with Lieutenant Hanley and Sergeant Chambers, was involved in the decision, made soon after October 2003, to transfer Semsroth to the less desirable Beat 39.

Second, Semsroth contends that Lieutenant Hanley failed to discipline Officer Tucker after Tucker, in April 2003, placed a photo of a Department award in Semsroth's locker, mocking her for being passed over for such an award. Captain Tabor and Sergeant Chambers were also involved in informally investigating this incident. The failure to discipline Tucker is sufficiently related to Semsroth's exhausted allegation that, in October 2003, Hanley, as well as Watts, failed to discipline officers for calling Semsroth a "bitch."

30

Third, Semsroth alleges that the Department presented awards to male officers involved in a dangerous call in June 2002, but did not give Semsroth the same award, despite her also taking part in this call. Semsroth complained about this unequal treatment to Lieutenant Hanley and Captain Tabor. And it was Semsroth's complaints about being passed over for these awards that prompted Tucker to place the mocking photo in Semsroth's locker. These allegations are sufficiently related to Semsroth's allegations that Hanley failed to discipline Officer Tucker for using the photo of a Department award to mock her.

A reasonable jury could find that all three of these additional allegations were part of the same unlawful employment practice that involved Semsroth's other exhausted harassment allegations. See Tademy, 520 F.3d at 1160; see also Duncan, 397 F.3d at 1309. They are temporally related, and they all involve the same supervisory officers.[16]

---

[16]Semsroth further alleged several other incidents of potentially sexually-based harassment: (i) Sergeant Kennedy, every time he saw Semsroth, would call her dumb and blonde, and (ii) Officer Bartel referred to Semsroth as "hot." We do not consider these allegations, however, because they are not sufficiently related to Semsroth's actionable claims. These two allegations involve different officers than those involved in the rest of Semsroth's actionable allegations. See Duncan, 397 F.3d at 1313. And Semsroth testified in her deposition that, while she found these comments "annoying" and "inappropriate," she did not find them offensive. On the basis of this record, we cannot say that, even drawing every inference in her favor, a reasonable jury could find that these comments were part of the same unlawful employment practices that underlie Semsroth's actionable allegations of sexual harassment. See Tademy, 520 F.3d at 1160; see also Duncan, 397 F.3d at 1309.

We now turn to the question of whether these actionable incidents of alleged sexual harassment are sufficient for Semsroth's hostile environment claim to survive summary judgment. We conclude they are.

Viewed in context and in the light most favorable to her, Semsroth's evidence establishes the following: Semsroth has been a police officer in the Department since September 2000. In June 2002, she was the only woman among the eight first responders to answer a call which involved a suspect shooting at officers. Eventually eighty-six officers responded to this situation. All of the seven male first responders received a department award, counselling and administrative leave. Semsroth, the only woman, did not.

As a result, in April 2003, Semsroth complained to her supervisors about what she perceived to be the Department's unequal treatment of male and female officers. After her complaints, a male officer, Officer Tucker, took photos of the awards given to the male officers and placed those photos in Semsroth's locker, with a note telling her "[C]ut these out and pin them on your uniform as you feel you deserve, it's probably the closest you will ever get to the real thing."[17] Semsroth reported this incident to her supervisor, Sergeant Chambers, who, in turn, reported it to his supervisor, Captain Tabor. Tabor promised Semsroth "that

_____

[17]On appeal, Semsroth does not appear to dispute that the seven male officers who first responded to the call received awards because they each came under direct fire from the suspect, while she did not.

there would be discipline," but no one conducted a formal investigation of Tucker's actions. Tabor, Hanley and Chambers did make Tucker apologize to Semsroth.

In mid-2003, male officers talking to Sergeant Watts and Lieutenant Hanley referred to Semsroth as a "bitch." Neither supervisor, however, apparently took any action against the male officers.[18] Instead, Watts and Hanley met with Semsroth, told her that other officers were calling her a "bitch," and "verbally counselled" her on how to handle the situation. Watts advised Semsroth to "let [her] hair down and go out and have beers with the guys."

In October 2003, Semsroth requested backup during a traffic stop. The dispatcher directed a male officer, Officer Nixon, to provide Semsroth with backup. Instead of doing so, Nixon argued with Semsroth over the radio on the need for backup. Nixon never provided Semsroth with backup. When Semsroth complained to their supervisor, Sergeant Watts, that Nixon's failure to provide

---

[18]Semsroth has proffered evidence that Lieutenant Hanley used the same term to refer to female officers. Co-defendant Heather Plush heard reports that Hanley told an entire squad that the women who filed this suit were "bitches" who "need[ed] to learn to get along." Plush also heard Hanley refer to a female officer as "a bitch" at the 2003 Department Christmas party. Although this evidence does not support a finding that Semsroth experienced a hostile work environment, because she does not allege that she knew of these comments, see Tademy, 520 F.3d at 1164, it may support a jury finding that Hanley condoned the use of the term by other officers or used it himself due to a discriminatory attitude towards women, c.f. Morgan, 536 U.S. at 113; Davidson v. Am. Online, Inc., 337 F.3d 1179, 1184 n.2 (10th Cir. 2003).

33

backup had jeopardized her safety, Watts responded that it was "just Nixon being Nixon." Watts agreed that Nixon should have provided her backup and said he would talk to Nixon, but Watts did not want Nixon to take it the wrong way.

A week later, Semsroth attended a women-officers-only lunch. Upon her return, Semsroth's supervisors interrogated her about the lunch.

Still another week later, Sergeant Watts and Lieutenant Hanley transferred Semsroth to Beat 39. As previously explained, Beat 39 was referred to as the banishment beat, a beat usually reserved for new officers or those being disciplined. It was a beat with diminished opportunities for career development. Watts and Hanley informed Semsroth that this transfer was "to get [her] kind of out and away . . . 'cause [she] was having some turmoil with a couple of male officers at the time." None of the male officers involved in this turmoil was transferred.

In light of this evidence, we must consider whether Semsroth has established the necessary elements to recover under her claim that her work environment was sexually hostile. See Harsco Corp., 475 F.3d at 1186 (listing elements). Semsroth, as a woman, is a member of a protected class. Her complaints to her supervisors establish that the harassment she perceived was unwelcome.

And, viewing the evidence in the light most favorable to Semsroth, her male supervisors and co-workers targeted her for harassment because of her

34

gender.  "[T]he critical issue in determining whether harassment is because of sex is whether members of one sex are subjected to a disadvantage to which the other sex is not."  Id.; see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

Here, the fact that Semsroth has presented evidence indicating that she was treated differently from similarly situated male officers supports this conclusion. See Oncale, 523 U.S. at 80-81.  For instance, when there was a personality conflict between Semsroth and her male co-workers, it was Semsroth and not the male officers who was transferred to the undesirable Beat 39.

In addition, evidence that Semsroth's supervisors used and tolerated the use of the word "bitch" further suggests that the harassment directed at Semsroth was based on her gender.  "[W]e have characterized th[at] word as a 'sexual epithet[]' that courts have described as 'intensely degrading'" to women.  PVNF, 487 F.3d at 799 (quoting Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1000 (10th Cir. 1996)); see also Reeves v. C.H. Robinson Worldwide, Inc., 525 F.3d 1139, 1144 (11th Cir. 2008).  When a supervisor "tolerate[s] the use of the word 'bitch' to describe" a plaintiff, "a jury should decide whether these comments were made because of gender animus."  PVNF, 487 F.3d at 799 (emphasis added); see also Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999) ("[G]ender-based insults, including the term 'bitch,' may give rise to an inference of discrimination based on sex.").

35

Moreover, a supervisor's use of terms like "bitch" can itself be a form of differential treatment, particularly when the supervisor uses the term to refer to many women. See Chavez v. Thomas & Betts Corp, 396 F.3d 1088, 1096 (10th Cir. 2005) ("[E]vidence supports the reasonable inference that [a supervisor] treated men and women differently . . . . [The supervisor] regularly directed sexually charged, humiliating, and hostile comments towards women [and] . . . regularly classified women as 'bitches.'"), overruling on other grounds recognized in Metzler v. Fed. Home Loan Bank, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006).

Even if not all of these incidents of alleged harassment can easily be categorized as overtly based on gender, some certainly can be. In light of that, we can consider it more likely that the other actions taken against Semsroth that are not overtly gender-based may well stem from the same discriminatory hostility. See Montes, 497 F.3d at 1172; Winsor, 79 F.3d at 1000; see also Herrera, 474 F.3d at 682 n.7.

Viewed in the light most favorable to her, Semsroth's evidence also establishes that this harassment was sufficiently severe and pervasive that a jury could find that it altered Semsroth's employment conditions. In making this determination, we consider "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

36

Harsco Corp., 475 F.3d at 1187; see also Harris, 510 U.S. at 23.

Much of this conduct occurred during a two-month period from October to December 2003. See PVNF, 487 F.3d at 799 (concluding evidence established pervasive harassment when the "bulk of it occurred during a relatively short period of time—[a] four-month period"). This suggests a pervasive pattern of harassment.

Of particular moment in considering the severity of the alleged harassment was the failure of Semsroth's supervisors to discipline Officer Nixon for failing to provide backup for Semsroth. See, e.g., Dawson v. County of Westchester, 373 F.3d 265, 273 (2d Cir. 2004) (holding that the evidence could support the finding of a pervasively hostile work environment because corrections "officers must depend upon their co-workers for mutual protection . . . in potentially dangerous situations [and], [i]n such a setting, actions of co-officers and superiors that undermine an officer's sense of personal safety . . . assume greater, not lesser, significance"); Jemmott v. Coughlin, 85 F.3d 61, 67 (2d Cir. 1996) (evidence could support the finding of a hostile work environment where coworkers of a black corrections officer "put him in danger of physical harm [by] refusing to send requested back-up assistance"); Apgar v. Wyoming, No. 99-8029, 2000 WL 1059444, at *6 (10th Cir. Aug. 2, 2000) (unpublished) (evidence could support the finding of a pervasively hostile work environment because, "[w]hile we would have a difficult time characterizing . . . ' silent treatment' as severe and

37

pervasive harassment in an office setting . . . the behavior takes on an entirely different meaning in the law enforcement context [because] [l]aw enforcement officers must rely on their fellow officers while on duty").  Nixon's failure to provide backup could have put Semsroth in physical danger.  And a jury could find that her supervisor's failure to address the issue adequately and discipline Nixon could create a risk that this conduct would be repeated.  See Tademy, 520 F.3d at 1167 (holding that past disciplinary failures were related to later racist incidents because "employees might well . . . conclude[] that they could engage in such behavior with minimal consequences").

Semsroth's evidence, if believed, is therefore sufficient to establish more than an isolated or occasional incident of gender-based harassment.  Rather, the evidence indicates a work environment that was permeated with gender-based intimidation and insult.

Lastly, Semsroth's evidence is sufficient for a jury to find the Department liable for this harassment under Title VII.  An employer will be liable "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  Burlington Indus. v. Ellerth, 524 U.S. 742, 765 (1998).  Further, the employer may be liable for a sexually hostile work environment "if the employer fails to take adequate remedial and preventative responses to any actually or constructively known harassment."  Holmes v. Utah, Dep't of Workforce Servs., 483 F.3d 1057, 1069 (10th Cir. 2007)

38

(citing Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 673 (10th Cir. 1998)); see also PVNF, 487 F.3d at 799 (suggesting employer would be on notice where plaintiff's "supervisor knew all about [the challenged] conduct and either chose to ignore it altogether or respond in only the most minimal of ways (e.g., forcing a half-hearted apology)"); Winsor, 79 F.3d at 1002 (concluding employer generally failed to take remedial action where, despite plaintiff's numerous complaints, her manager suggested instead that she "grit her teeth and hang in there" because she was working in a tough business and a lot of her male counterparts were unhappy with plaintiff's success). "Actual knowledge is usually demonstrable where," as here, the evidence indicates that "the plaintiff has reported harassment to management-level employees." Harsco Corp., 475 F.3d at 1188.

For all of these reasons, we conclude that Officer Semsroth's hostile work environment is sufficient to survive summary judgment. "It may be that a jury would agree with [the Department] that [Semsroth] was not subjected to a severe or pervasively hostile environment based on her sex, but that is not for this Court to decide." PVNF, 487 F.3d at 800.

### b.    Officer Voyles

Officer Voyles, too, asserts a hostile work environment claim. We must, again, determine which of the allegations Voyles asserts in support of this claim we can consider. As previously addressed, Voyles made two timely and thus actionable allegations in her EEOC complaint: (i) an allegation regarding a

39

supervisor's negative and derogatory comments regarding Voyles's body and eating habits made while Voyles was pregnant; and (ii) an allegation regarding an oral reprimand from a supervisor in front of various media personnel. We focus on those allegations.[19]

The evidence, viewed in the light most favorable to Voyles, indicates that, during her pregnancy, her supervisor, Lieutenant Bohannon, would make derogatory remarks about Voyles's weight and her eating habits. Voyles complained about these remarks to Deputy Chief Stoltz, who responded that "that's kind of how [Bohannon] was."

Voyles alleged that, during this same time period, Bohannon verbally reprimanded her in front of the media. In her deposition, however, Voyles instead testified that Bohannon stated, during a telephone conversation, that Voyles was being difficult. This conversation occurred in an open room where the media was gathered for a daily Department briefing. Although Voyles overheard this remark, she did not know if any members of the media heard it.

Although we do not engage in a simple counting exercise to determine the

---

[19]In addition, Voyles alleges several other incidents of potentially sexually-based harassment, including: (i) an allegation that a fellow officer harassed her during a traffic stop; (ii) an allegation that she received disparate disciplinary treatment for failing to write a sufficient number of tickets in a given period; and (iii) an allegation that she received disparate disciplinary treatment for failing to attend the required number of community meetings. But we do not address these three additional allegations Voyles makes because they are unrelated to her two actionable claims.

pervasiveness of the harassment, Voyles's claims constitute a few isolated incidents rather a hostile work environment. Herrera, 474 F.3d at 680 n.3. Her allegations are not so severe or pervasive that a reasonable jury could find that they altered the conditions of her employment. See Tademy, 520 F.3d at 1162; Herrera, 474 F.3d at 680. It is beyond question that these experiences were unpleasant, and the breadth of the allegations made in this case suggests that the Department must remain vigilant to ensure discrimination does not take place; however, given the claims properly before this court, we must conclude that Voyles did not establish that these interactions created a hostile work environment that altered her conditions of employment. Accordingly, summary judgment in the Department's favor on this claim was proper.

## III.

As a final matter, in their brief, the Officers contend that the district court improperly excluded their expert report and other summary judgment evidence. We review this contention for abuse of discretion, Bryant v. Farmers Ins. Exchange, 432 F.3d 1114, 1122 (10th Cir. 2005), and we disagree that the district court erred. The district court excluded summary judgment evidence that violated the local rules or contained inadmissible content pursuant to the Federal Rules of Evidence. Accordingly, the district court did not abuse its discretion by excluding this evidence. Id.; Hernandez v. George, 793 F.2d 264, 266 (10th Cir. 1986).

41

## IV.

The Officers' allegations and summary judgment evidence in this case are quite troubling. The allegations suggest that sexual discrimination remains a concern within the Department. Federal law prohibits such discrimination and we strongly regret the presence of any such misconduct. Nevertheless, in the instant case, for the most part the Officers fail to demonstrate that discriminatory motives played a role in the Department's employment decisions that were properly before the district court.

We REVERSE the district court's decision granting the defendants summary judgment on Officer Semsroth's retaliation and hostile-environment claims and REMAND those two claims for a trial. In all other respects, we AFFIRM the district court's decision granting the defendants summary judgment.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge

42